

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. PD-0987-09

**RICHARD LYNN WINFREY, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE ELEVENTH COURT OF APPEALS SAN JACINTO COUNTY**

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., PRICE, WOMACK, JOHNSON, KEASLER, HOLCOMB and COCHRAN, JJ., joined. COCHRAN, J., filed a concurring opinion in which WOMACK, JOHNSON and HOLCOMB, JJ., joined. MEYERS, J., did not participate.

### O P I N I O N

Charged with the capital murder of Murray Wayne Burr, appellant was convicted of the lesser offense of murder and sentenced to seventy-five years in prison. We reverse the court of appeals and render an acquittal.

### I. FACTUAL & PROCEDURAL BACKGROUND

In August 2004, Murray Wayne Burr was found murdered in his home. Evidence at trial

indicated that the victim had been stabbed twenty-eight times and had received multiple blunt-force injuries, including a broken right-eye orbit and a broken jaw. There was no evidence of forced entry into the victim's home. The evidence indicated that the victim was dragged from his living room to his bedroom where his body was found. Family members reported that the only item missing from the victim's home was a Bible.

Investigators collected a variety of forensic evidence from the crime scene including: a partial bloody fingerprint, a bloody shoe print, and several hair samples. Neither the prints nor the hair samples matched appellant. Investigators were able to obtain a DNA profile from evidence at the crime scene, however, the profile excluded appellant and his family members.[1] Appellant's children, Megan (then 16 years of age) and Richard Winfrey Jr. (then 17 years of age), became persons of interest in the murder investigation. Texas Rangers interviewed appellant approximately two weeks after the murder. Appellant was not considered a suspect at this time. During the interview, appellant stated that he had known the victim, that he had never been in the victim's house, that he had not seen the victim in four to five years, and that he assumed he was the number one suspect.[2]

In July 2006, the Sheriff's Department received new information about the Burr murder from David Campbell, an inmate in the Montgomery County Jail. Campbell testified at the trial that, while he was sharing a cell with appellant, appellant relayed information that he claimed to have heard about the murder; specifically, that "some kind of gun and some knife collection" were taken

---

[1] According to appellant's discretionary-review petition: 1) appellant and both his children (Megan and Richard Jr.) were indicted for the capital murder of Murray Wayne Burr, 2) Megan was convicted of capital murder and conspiracy and her appeal is currently pending, and 3) Richard Jr. was acquitted of capital murder and conspiracy.

[2] The videotaped interview was not included in the appellate record, although the Texas Ranger who interviewed appellant discussed the conversation in his testimony.

from the Burr residence. Appellant related other details to Campbell that he claimed to have heard about the murder, such as the victim's body being dragged from one room to another and the lack of forced entry. Appellant did not tell Campbell that he was involved in the murder.

To assist in the investigation, Texas Ranger Grover Huff contacted Deputy Keith Pikett, a dog handler with the Fort Bend County Sheriff's office. Deputy Pikett testified about a "scent lineup" that he conducted nearly three years after the murder in August 2007. He used his three bloodhounds, Quincy, James Bond, and Clue. This involved obtaining scent samples from clothing that the victim was wearing at the time of his death and from six white males, including appellant. The dogs were "pre-scented" on the scent samples obtained from the victim's clothing. The dogs then walked a line of paint cans containing the scent samples of the six white males. All three dogs alerted on the can containing appellant's scent sample.[3]

Based on this, Deputy Pikett concluded that appellant's scent was on the victim's clothing. Deputy Pikett testified on cross-examination that an alert only establishes some relationship between the scent and objects and that scent detection does not necessarily indicate person-to-person contact.[4]

---

[3] An "alert" occurs when the canine matches the scent from the victim's scent pad to the suspect's scent pad. A similar "scent lineup" was conducted in August 2004 on scent samples from appellant's children with two dogs, Quincy and Jag. Both of these dogs alerted on the children's scent samples.

[4] The State seems to claim that Pikett testified that the results of the dog-scent lineup established direct contact between appellant and the victim's clothes at the time of the victim's death. We do not so read Pikett's testimony. Pikett testified on direct examination:

> Q.    [State] Now, based on the results of that final scent lineup, do you believe that the scent of [appellant] is on the scent on the clothing of [the victim]?
> A.    [Pikett] Yes.

Pikett testified on cross-examination:

(continued...)

[4](...continued)

Q.      [Defense Counsel] All it does is that it establishes a relationship, does it not?

A.      [Pikett] It puts that person in contact with something.

Q.      It puts the person in contact with something, not necessarily person-to-person, does it?

A.      No.  Without knowing the specifics of anything, no, you can't say that.

Q       If I come up and I shake your hand, am I going to get some of your skin cells?

A.      Yes.

Q.      Now, if I come over here and grab [one of the prosecutors] on the arm, have your skin cells transferred to him?

A.      Yes.

Q.      Did you touch him?

A.      No.

* * *

Q.      Again, an alert by a dog is nothing but to establish some sort of a relationship between the scents and the objects, would you agree?

A.      Yes.

On redirect examination, Pikett testified:

Q.      [State] So that's essentially what you've been testifying to all along, physical contact?

[Defense] I object to that, Your Honor, physical contact made between objects, if you would clarify that.

Q.      [State] Physical contact where someone else leaves their scent on someone else through physical contact.

A.      Yes.

* * *

Q.      And that's what we're talking about, significant physical contact.

A.      Yes.

Q.      And that's all your dogs are looking for; is that correct?

A.      Yes.

On recross-examination, Pikett testified:

(continued...)

Deputy Pikett also testified on cross-examination that his understanding of the law was that convicting a person solely on a dog scent is illegal.

Appellant complained on direct appeal that the evidence is legally and factually insufficient to support a conviction of murder. In its published opinion affirming the trial court, the court of appeals addressed the sufficiency of the evidence in a two-paragraph analysis. Concluding that the evidence was legally and factually sufficient, the court of appeals specifically found: (1) Deputy Pikett's canine-scent testimony provided direct evidence placing appellant in direct contact with Burr's clothing; (2) the jury could have reasonably concluded that appellant was in Burr's house at the time of the murder and that he had significant physical contact with Burr; (3) appellant shared information about the murder with Campbell that was not known, even by the police; and (4) appellant identified himself as the "number one suspect" in the murder at a time when the police did not consider him a suspect. *Winfrey v. State*, 291 S.W.3d 68, 75 (Tex.App.–Eastland 2009).

Pursuant to Rule 68 of the Texas Rules of Appellate Procedure, appellant timely filed a petition for discretionary review. We granted review to address the following grounds presented to this court:

> (1) An important question implicating the administration of justice is presented by the Court of Appeals' reliance upon a dog scent lineup to sustain the legal sufficiency of the evidence without regard to the inherent limitations of such evidence.

> (2) An important question implicating the administration of justice is also presented by the Court of Appeals' failure to properly evaluate the factual sufficiency of the evidence by addressing the inherent limitations of dog scent lineup evidence.

---

[4](...continued)
Q.    All it does is establish a scent relationship between the articles.
A.    You mean between the person and the clothing?
Q.    The scent matches, yes.
A.    Yes.

Appellant contends the evidence, when viewed in a neutral light, is factually insufficient to support a conviction of murder. He further contends that the evidence, even when viewed in the light most favorable to the verdict, is legally insufficient to support a conviction of murder. The State argues that the court of appeals applied the proper standards of review for legal and factual sufficiency and that a jury could have reasonably concluded that appellant murdered Murray Wayne Burr.

## II. STANDARD OF REVIEW

We begin our analysis by addressing the question of legal sufficiency. When reviewing a case for legal sufficiency, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Consequently, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). It has been said, quite appropriately, that "[t]he appellate scales are supposed to be weighted in favor of upholding a trial court's judgment of conviction, and this weighting includes, for example, the highly deferential standard of review for legal-sufficiency claims." *Haynes v. State*, 273 S.W.3d 183, 195 (Tex. Crim. App. 2008) (Keller J., dissenting) (citing *Jackson v. Virginia*, 443 U.S. at 319). We must therefore determine whether the evidence presented to the jury, viewed in the light most favorable to the verdict, proves beyond a reasonable doubt that appellant intentionally or knowingly caused the death of Murray Wayne Burr.

### III. ANALYSIS

**A.    Appellant's Statement to Authorities**

During trial, Texas Ranger Grover Huff testified that he interviewed appellant in 2004 and that appellant indicated that he was the number one suspect.

Q.    And did he indicate whether he had ever been in Murray Burr's home?

A.    He stated that he had never been inside of Murray Burr's residence.

Q.    Did he indicate whether he thought he was a suspect?

A.    Yes.

Q.    What did he indicate?

A.    His statement to me was he was the number one suspect.

In closing arguments, the prosecution emphasized this statement as evidence of appellant's guilt.

I think defense counsel said in closing there is nothing to put Richard Lynn Winfrey, Sr., in that trailer. Nothing to put Megan Winfrey or Richard Winfrey, Jr. First of all, early in the investigation, when they were looking at Megan Winfrey and Richard Lynn Winfrey, Jr., Ranger Huff said he went and talked to Richard Sr. They were looking at the kids. Kind of interesting, what was Richard Lynn Winfrey, Sr.'s, words, "Well, I guess I'm the primary suspect here." He said he is the primary suspect at that point in time.

In its briefs to the court of appeals and to this Court, the State relies on appellant's statement as evidence of his guilt.[5] Indeed, in affirming appellant's conviction, the court of appeals relied on appellant's statement, concluding that "appellant identified himself as the 'number one suspect' in

---

[5] In its brief to the court of appeals, the State argued that "Richard Winfrey Sr. indicated to Texas Ranger Grover Huff that he was the primary suspect early in the investigation when Huff was focusing on Winfrey's children." In its brief to this Court, the State argues "Coupled with the statements made during the interview with Ranger Huff, when Petitioner stated he had never been in the Burr home and had not seen Burr in five years, and at the same time stated he was the 'number one suspect,' the jury, as trier of fact, could certainly attach a great weight to the canine scent evidence in light of Petitioner's contradictory statements."

the murder at a time when the police did not consider him a suspect." *Winfrey*, 291 S.W.3d at 75.

This statement is not tantamount to an admission of guilt. At no time during the interview did

appellant admit to any involvement. Nor did the police consider him a suspect, much less a primary

one. The Texas Ranger who interviewed appellant placed little emphasis on the statement and

acknowledged that even after the statement, appellant was not a suspect. In fact, he was not arrested

until nearly three years later.

**B.      Cellmate**

The court of appeals also found it significant that appellant "shared information about the

murder with Campbell that was not even known by the police" and that "would only be known by

the murderer or murderers." *Winfrey*, 291 S.W.3d at 74. According to the court of appeals,

appellant "told Campbell that 'some kind of a gun and some knife collection' had been taken from

Burr's house."[6] *id.*

The evidence, however, is that appellant told Campbell that he *heard* that "some kind of a

gun and some knife collection" were taken from the victim's home. That appellant stated that he had

heard that a gun or knife collection was taken is a subtle, yet significant distinction. Appellant never

told Campbell that he was involved in the murder. Campbell himself made it clear that his entire

testimony was based on information that appellant had *heard*.

> Q.      [Defense] The things that you said that Mr. Winfrey told you while in
> Montgomery County jail was [sic] things that Mr. Winfrey told you that he
> had heard; is that correct?

---

[6] In the summer of 2006, the Sheriff's Department interviewed Jessie Oates, the victim's brother-in-law. Oates informed the Sheriff's department that the victim owned a rifle and a shot-gun, which the victim showed to him about six months before the murder. Oates did not know if these guns were in the victim's home when he was murdered. Neither of these guns nor a knife collection was ever recovered. It is questionable whether the evidence would support a finding that these guns were taken from the victim's house at the time of the murder. We will, however, assume that, viewed in the light most favorable to the verdict, the evidence supports a finding that "some kind of a gun and some knife collection" were taken from the victim's home.

A.     [Campbell]  Yes.

Q.     [Defense]  Things that he had heard, it had been two years since the death of Mr. Burr.  And the things that Mr. Winfrey told you was [sic] things that he told you that he had heard?

A.     [Campbell]  Yes, that's what I said, hearsay.

\*     \*     \*

Q.     [State]  When he told you about Murray being beaten and stabbed, no one in law enforcement had contacted you?

A.     [Campbell]  It was all hearsay what I heard from him, just hearsay.

Q.     [State]  And he told you about the penis,[7] nobody had talked to you about anything?

A.     [Campbell]  It is just hearsay from what he was going to be charged with.

Q.     [State]  And when he told you that somebody had let the actor in the house, nobody from law enforcement had talked too [sic] you about a murder at that time?

A.     [Campbell]  No sir, just hearsay directly from him.

The court of appeals found that appellant "told Campbell that 'some kind of a gun and some knife collection' had been taken from Burr's house.  Before Sheriff Rogers's interview of Campbell, the police had no information that guns had been taken from the house.  Thus, appellant shared information about the murder with Campbell that was not even known by the police." *Winfrey*, 291 S.W.3d at 74.  Appellant never admitted involvement in the murder and claimed only to have *heard* information about the crime not known to the police.  Thus, it is possible that the information appellant heard could have come from the actual murderer or murderers.

C.     **Dog-Scent Lineup**

---

[7] Appellant also told Campbell that he had heard that the victim's penis had been mutilated, a statement that was inaccurate.

At the request of the Texas Rangers, Deputy Keith Pikett performed the dog-scent lineup.[8] Deputy Pikett, a certified peace officer who specializes in canine handling, testified that he had been training bloodhounds since 1989. At trial, Deputy Pikett explained the scent lineup procedure:

> We use 6-quart paint cans that have numbers on them. They're just clean paint cans, and I put a piece of wood on the bottom of them so they are more stable and they're numbered. I set the paint cans out. I typically go like ten walking steps, put a can down; ten walking steps, put a can down. The cans are placed so there–with a crosswind–so if the can is here and the next can is here, the wind is going either this way or this way. We don't want the scent from can 2 blowing toward 3 or toward can 1. We want the wind to be blowing away, so it's not going to cross-contaminate that way. So we check that. Then I set the cans out.

On August 22, 2007, a scent lineup was conducted, and appellant's scent was placed in paint can number four. Deputy Pikett had no knowledge where appellant's scent was placed. He used three bloodhounds during this scent lineup: James Bond, Quincy, and Clue. All three alerted to appellant's scent in paint can number four.

This however, is not proof positive that appellant came in contact with the victim. Even when viewed in the light most favorable to the verdict, the dog-scent lineup proves only that appellant's scent was on the victim's clothes, not that appellant had been in direct contact with the victim, as the court of appeals decided.

This important distinction is highlighted in the Federal Bureau of Investigation's publication, *Forensic Science Communications*, which explains that "[i]dentifying someone's scent at a crime scene is not an indication of complicity. It simply establishe[s] a direct or indirect relationship to the scene." Rex A. Stockham et al., *Specialized Use of Human Scent in Criminal Investigations*,

---

[8] A scent lineup is a forensic tool where dogs use their enhanced sense of smell to match scents. Using a gauze pad, scent exemplars are obtained from the crime scene or from an object found at the crime scene, as well as from a suspect. The gauze pad with the suspect's scent is then placed in a "lineup" with several other scents. Before doing the lineup, the dog sniffs the gauze pad from the crime scene. The dog then walks the lineup and alerts if it recognizes any of the scents.

6 FORENSIC SCI. COMM. 3, 6 (2004). This sentiment was echoed in Deputy Pikett's testimony.

> Q.    [Defense Counsel] All it does is establish a scent relationship between the articles?
>
> A.    [Deputy Pikett] You mean between the person and the clothing?
>
> Q.    [Defense Counsel] The scent matches, yes.
>
> A.    [Deputy Pikett] Yes.

During his testimony, Deputy Pikett acknowledged, "It's possible to transfer scent. . . . If I shake hands with you, I can give you the scent on my hand." The ease of transferring scents is well documented and is also accepted by law enforcement agencies such as the FBI. *Id.* at 1 ("Because human scent is easily transferred from one person or object to another, it should not be used as primary evidence. However, when used in corroboration with other evidence, it has become a proven tool that can establish a connection to the crime.").

At oral argument, the State conceded that "dog scent alone is not enough [to convict the defendant]." Deputy Pikett also recognized the limitations of the scent lineup in his testimony when he stated that: "We never convict anybody solely on the dog. It is illegal in the State of Texas. . . . You cannot convict solely on the dog's testimony." However, the record indicates, and the State acknowledged, that the jury gave significant weight to the canine-scent evidence. The jury submitted a note asking, "Is it illegal to convict solely on the scent pad evidence?"[9] No eye witnesses put the appellant at the crime scene. The State was unable to match the appellant to the fingerprint or to any of the footprints found at the crime scene. The appellant did not match the DNA profile obtained from the crime scene. Criminologists microscopically compared seventy-three hairs recovered from the crime scene, yet none of the hairs were consistent with appellant's. None of the victim's

---

[9] In a written response, the trial court replied, "I can only refer you to the instructions in the charge."

belongings were found in appellant's possession. Not a Bible, a gun, or a knife collection. *Winfrey*, 291 S.W.3d at 72 ("In summary, none of the items tested at the DPS crime laboratories tied appellant to the murder scene.").

The *Jackson v. Virginia* legal-sufficiency standard requires the reviewing court to view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime *beyond a reasonable doubt. Jackson*, 443 U.S. at 319. At most, the evidence here shows: (1) appellant indicated that he believed he was the number one suspect in a murder investigation; (2) appellant shared information with Campbell that appellant claimed to have heard about the murder; and (3) appellant's scent was on the victim's clothes. It is the obligation and responsibility of appellate courts "to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Furthermore, "[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient [to convict]." *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992), *superseded in part on other grounds*, *Herrin v. State*, 125 S.W.3d 436, 443 (Tex. Crim. App. 2002). Based on our review of this record, we find that the evidence, even when viewed in the light most favorable to the verdict, merely raises a suspicion of guilt and is legally insufficient to support a conviction of murder beyond a reasonable doubt. Because we find the evidence legally insufficient, we need not address appellant's factual-sufficiency claim.

We note, however, that the science underlying canine-scent lineups has been questioned; thus, we think it proper to briefly address the issue. Law-enforcement personnel have long utilized canines in crime management. For example, dogs have been employed for detecting narcotics and explosives, for tracking trails, in search-and-rescue operations, for locating cadavers, and for

discriminating between scents for identification purposes. In thousands of cases, canines and their handlers have performed with distinction. Despite this success, we acknowledge the invariable truth espoused by Justice Souter that "[t]he infallible dog, however, is a creature of legal fiction." *Illinois v. Caballes*, 543 U.S. 405, 411 (2005) (Souter J., dissenting).

This case pertains to canines used to discriminate among human scents in order to identify a specific person in a lineup. This process is often referred to as human-scent discrimination. Some courts, including the Fourteenth Court of Appeals, have determined that for purposes of admissibility, "there is little distinction between a scent lineup and a situation where a dog is required to track an individual's scent over an area traversed by multiple persons." *Winston v. State*, 78 S.W.3d 522, 527 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (citing *Roberts v. State*, 469 A.2d 442, 447-48 (Md. Ct. App. 1983)). Other courts, such as the Supreme Court of Florida, have distinguished scent lineups from dog tracking. *Ramos v. State*, 496 So. 2d 121, 123 (Fla. 1986) ("[I]t is important to recognize that using a dog to track a human or to detect the presence of drugs or explosives is distinctive from using a dog to directly identify a specific human from items in a lineup.").

Cases involving the use of dogs, usually bloodhounds, to track humans are abundant and the law is well settled in regards to admissibility of such evidence with only a minority of courts outright rejecting bloodhound evidence. *People v. Cruz*, 643 N.E.2d 636, 662 (Ill. 1994); *Brafford v. State*, 516 N.E.2d 45, 49 (Ind. 1987); *State v. Storm*, 238 P.2d 1161, 1181-82 (Mont. 1952); *Brott v. State*, 97 N.W. 593, 594 (Neb. 1903). Fewer courts have addressed the question of whether dog evidence is sufficient to sustain a conviction when it is the only evidence. However, as early as 1913, our colleagues at the Supreme Court of Mississippi held that dog tracking evidence, alone and unsupported, to be insufficient to affirm a conviction. *Carter v. Mississippi*, 64 So. 215, 215 (Miss.

1913).  And as recently as 1983, the Supreme Court of Washington agreed.  *State v. Loucks*, 656 P.2d 480, 483 (Wash. 1983).  In fact, our research suggests the courts that have passed on this issue have concluded that dog-scent evidence, when admissible, is insufficient, standing alone, to sustain a conviction.  *State v. Taylor*, 395 A.2d 505, 507 (N.H. 1978); *State v. Cheatham*, 458 S.W.2d 336, 339 (Mo. 1970);  *State v. Green*, 26 So. 2d 487, 489 (La. 1946); *Buck v. State*, 138 P.2d 115, 123 (Okla. Crim. App. 1943); *Copley v. State*, 281 S.W. 460, 461 (Tenn. 1926).

Like our sister courts across the country, we now hold that scent-discrimination lineups, whether conducted with individuals or inanimate objects, to be separate and distinct from dog-scent tracking evidence.  "Even the briefest review of the scientific principles underlying dog scenting reveals that, contrary to the conclusions of many courts, there are significant scientific differences among the various uses of scenting: tracking, narcotics detection, and scent lineups." Andrew E. Taslitz, *Does the Cold Nose Know? The Unscientific Myth of Dog Scenting*, 42 HASTINGS L.J. 15, 42 (1990) (explaining that drug detection canines need only determine whether a specific scent is present.  Tracking dogs, on the other hand, have the benefit of using both vegetative scents and human scent, while canines performing scent lineups must find one specific scent among many competing, similar scents). The FBI agrees, noting that tracking canines use human scent *and* environmental cues to locate the track of an individual.  Allison M. Curran, et al., *Analysis of the Uniqueness and Persistence of Human Scent*, 7 FORENSIC SCI. COMM. 2 (2005).  Accordingly, we conclude that scent-discrimination lineups, when used alone or as primary evidence, are legally insufficient to support a conviction.  Like the Supreme Court of Washington, we believe that "[t]he dangers inherent in the use of dog tracking evidence can only be alleviated by the presence of corroborating evidence." *Loucks*, 656 P.2d at 482.  To the extent that lower-court opinions suggest

otherwise, we overrule them and expressly hold that when inculpatory evidence is obtained from a dog-scent lineup, its role in the court room is merely supportive.

The State argues in its brief:

> During the videotaped canine scent lineup on August 22, 2007, all the dogs made positive hits on [appellant's] scent pads, indicating that [appellant] had been in contact with the clothes [the victim] was wearing at the time of his death.[10] This is significant because in the earlier interview with [appellant] in 2004, he indicated that he had **NEVER** been in [the victim's] home and had not seen [the victim] in five years.
>
> An effort was made by defense counsel to advance a theory of "transferred scent" or "casual contact" to explain how [appellant's] scent would be on the clothes the victim had on at the time of death. Keith Pikett testified that the scent is essentially from skin cells sloughed off by the provider of the skin cells.[11] Pikett testified that, based on the scent lineups, [appellant's daughter, appellant's son and appellant] had left their scent on the clothes the victim was wearing at the time of his death. Following cross-examination, Pikett also indicated that a boyfriend and girlfriend would have significant contact with each other, more than with family members. But none of the dogs hit on Christopher Hammond's scent pads. In that regard the jury could certainly draw the inference that if [appellant's daughter's] boyfriend at the time of the murder was Christopher Hammond, then under the transferred scent or casual contact theory, it would be **MORE** likely that if she touched [the victim's] clothes, Hammond's scent rather than her father, [appellant's] scent would have been transferred.

(Emphasis in original and record reference omitted).

---

[10] We do not read the phrase, "indicating that [appellant] had been in contact with the clothes [the victim] was wearing at the time of his death," as necessarily meaning that appellant had direct contact with the victim's clothes at the time of the victim's death. Consistent with Pikett's testimony, we understand this phrase to mean that appellant's scent was on the victim's clothes at the time of the victim's death.

[11] Pikett testified that "human beings lose probably conservatively 15 million skin cells a day" and "that's what the dog is smelling." Pikett also testified that the dog is trained to smell human skin cells but that he did not know what "ingredient" the dog is smelling. The State argued during closing jury arguments that it could not tell the jury "the mechanics of how the dogs do what they do, but they sure do it."

It cannot be denied that the jury and the court of appeals found the dog-scent lineup evidence in this case to be compelling. In 2004, two different dogs alerted only to the scents of appellant's son and daughter. In 2007, three different dogs alerted only to appellant's scent. But, the question essentially presented in this case is whether dog-scent lineup evidence alone can support a conviction beyond a reasonable doubt. And, while this evidence may raise a strong suspicion of appellant's guilt, we nevertheless decide that, standing alone, it is insufficient to establish a person's guilt beyond a reasonable doubt.

The judgment of the court of appeals is reversed, and a judgment of acquittal is entered. *Burks v. United States,* 437 U.S. 1, 18, (1978) (holding if the record evidence is legally insufficient under the *Jackson* rule, the reviewing court must render a judgment of acquittal).

J. Hervey

Delivered: September 22, 2010
Published: