ACCEPTED
14-14-00696-CR
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
6/18/2015 2:58:43 PM
CHRISTOPHER PRINE
CLERK

No. 14-14-00696-CR

IN THE COURT OF APPEALS
THE FOURTEENTH DISTRICT OF TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
6/18/2015 2:58:43 PM
CHRISTOPHER A. PRINE
Clerk

ALEJANDRO MORALES CALLES
*Appellant*

v.

THE STATE OF TEXAS
*Appellee*

On Appeal from Cause Number 1384626
184th District Court, Harris County, Texas
Honorable Jan Krocker, Judge Presiding

APPELLANT'S AMENDED BRIEF

ORAL ARGUMENT REQUESTED

ALEXANDER BUNIN
Chief Public Defender
Harris County, Texas

MELISSA MARTIN
Assistant Public Defender
Harris County, Texas
TBN  24002532
1201 Franklin St, 13th Floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278
melissa.martin@pdo.hctx.net

Counsel for Appellant

IDENTITY OF PARTIES AND COUNSEL


APPELLANT:                              Alejandro Morales Calles
                                        SPN# 00972606
                                        701 N San Jacinto
                                        Houston, TX 77002


TRIAL PROSECUTOR:                       Anthony Robinson
                                        Assistant District Attorney
                                        Harris County Texas
                                        1201 Franklin St, 6th Floor
                                        Houston, TX 77002


DEFENSE COUNSEL AT TRIAL:               John Garner Reed
                                        Attorney at Law
                                        2100 E. Nasa Pkwy Ste n201
                                        Seabrook, TX 77586


COUNSEL ON APPEAL FOR APPELLANT:        Melissa Martin
                                        Assistant Public Defender
                                        Harris County TX
                                        1201 Franklin St, 13th Floor
                                        Houston, TX 77002
                                        melissa.martin@pdo.hctx.net


PRESIDING JUDGE:                        Hon. Jan Krocker
                                        184th District Court
                                        Harris County, TX
                                        1201 Franklin St, 17th Floor
                                        Houston, TX 77002

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ...................................................................................ii

TABLE OF CONTENTS ....................................................................................................iii

INDEX OF AUTHORITIES ................................................................................................iv

STATEMENT OF THE CASE...............................................................................................1

    M.G.'S TALE .........................................................................................................2

    ALEX'S TALE .........................................................................................................3

STATEMENT OF FACTS...................................................................................................1

ISSUE PRESENTED .......................................................................................................3

> **THE EVIDENCE OFFERED BY THE STATE WAS LEGALLY INSUFFICIENT FOR A RATIONAL JURY TO CONVICT APPELLANT UNDER *JACKSON V. VIRGINIA*, 443 U.S. 307, 318 (1979).**

SUMMARY OF THE ARGUMENT .........................................................................................4

ARGUMENT .................................................................................................................5

    A.  STANDARD OF REVIEW ......................................................................................4

    B.  M.G.'S TESTIMONY AS TO THE INCIDENT ............................................................6

    C.  THE OUTCRY..................................................................................................14

CONCLUSION .............................................................................................................21

PRAYER ...................................................................................................................25

CERTIFICATE OF SERVICE .............................................................................................26

CERTIFICATE OF COMPLIANCE.........................................................................................2

# INDEX OF AUTHORITIES

**Cases**

*Ervin v. State,* 331 S.W. 3d 49 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) .......... 5

*Gear v. State*, 340 S.W.3d 743 (Tex. Crim. App. 2011) ....................................................... 5

*Jackson v. Virginia*, 443 U.S. 307 (1979) ................................................................4, 5, 6, 22

*Winfrey v. State*, 323 S.W.3d 875 (Tex. Crim. App. 2010) .............................................. 5, 22

iv

**STATEMENT OF THE CASE**

On a hot July day in 2012, Mr. Morales Calles (hereafter, Alex) was working in his backyard when his fiancée, M.O., called him from work to let him know her sister, D.O., and her fiancée, GG, would be dropping four of their children off for him to watch while they went to an appointment with D.O.s doctor (3 R.R. at 8;.13).

G.G. and D.O. brought G.G., Jr., M.G. (the complainant), Mariah, and Isaiah to Alex's house, where they played on the tire swing with M.O.'s and Alex's two children, Juliana and Jeremiah (3 R.R. at 13; 35-36). After about 20 minutes, everyone went inside because it was getting too hot; M.G. and Alex both testified that they all started watching a movie in the living room (3 R.R at 37; 4 R.R. at 132). M.G. and Alex both testified the TV faced a full-sized sofa and a reclining chair, with a loveseat at a right-angle, facing the recliner (3 R.R. at 38; 4R.R. at 132).



(diagram not to scale).

No photographs or floorplan of the home's interior were offered into evidence; only photos of the outside of the very small house were produced.

1

According to both Alex and M.G., some of the children, including M.G., started out sitting on the sofa to watch the movie and Alex sat on the recliner with his feet up, working on his laptop (3 R.R. at 39; 5 R.R. at 21).

At this point, Alex's and M.G.'s stories diverge.

### M.G.'s Tale

Isaiah, the youngest child there, got some toys out of Alex's children's room and brought them to the sofa (3 R.R. at 39). The prosecutor then asked M.G. the following:

> Q. So, once he puts all the toys on the couch, was it just not enough room left?
>
> A. There wasn't. So, I had to move. Like I was squished on the couch.

(3 R.R. at 41).

M.G. testified she then moved to the loveseat and sat facing the TV (3 R.R. at 44).

> Q. So, you're on the sofa, kind of by yourself at this time. Kind of walk us through what happens next while you're on the sofa.
>
> A. He grabs my pants.
>
> Q. Okay.
>
> A. Tugs them like to the side.
>
> Q. Well, can you kind of – I couldn't see. Can you stand up?
>
> A. (Witness complies.) Pulls them like this to the side (indicating). He kind of pulled them.

2

MR. ROBINSON: May the record reflect that the witness has taken her fingers and pulling her pants at the belt loop area?

THE COURT: Yes, sir.

THE WITNESS: Yes, sir.

Q.   (BY MR. ROBINSON) You may sit. So, as he grabs your pants, what does he do?

A.   He tries to go in my pants.

(3 R.R. at 45).

M.G. goes on to state that Alex was successful in "go[ing] in" her pants and inserted to fingers inside the "lips" of her vagina (3 R.R. at 50-51).

Further details of M.G.'s testimony and statements she made to law enforcement and her father will be introduced in argument.

**Alex's Tale**

When M.O. called him to let him know M.G. and the other children were going to be dropped off, Alex was replacing rotting wood on the back porch, using a compressor and a nail gun (4 R.R. at 129-30). He was not happy about having to watch four children in addition to his own because he was working on the porch project (4 R.R. at 130). When M.G. and the others arrived they went straight to the tire swing to play on it (4 R.R.at 131). Because it was hot, Alex had them go inside to watch a movie (4 R.R. at 131). Alex collected up his tools and then went inside (4 R.R. at 131).

M.G. selected the movie and was sitting on the long couch (4 R.R. at 132). Alex sat on his recliner and was looking at his laptop (4 R.R. at 132). After a while, M.G.

came closer to Alex and was "spinning around" (4 R.R. at 132). "And I was trying to look at my laptop, and she was messing with me kind of like in a friendly way" (4 R.R. at 132). Alex showed the jury a bump on his head that he sustained in an accident and he said M.G. was messing with it (4 R.R. at 133).

Eventually, Alex became irritated with M.G.'s playing around with him when he thought she should be taking care of the younger children, particularly Isaiah, who was about one at the time (4 R.R. at 134). "She was over top of me, and she don't listen to me. So, I just call her that she was a lazy ass little kid, that she don't respect orders, and I'm going to tell her dad what she is doing" (4 R.R. at 135). In his frustration he pushed her away forcefully (5 R.R. at 31). He regretted pushing her and being angry with her (5 R.R. at 31).

## Issue Presented

The evidence offered by the state was legally insufficient for a rational jury to convict appellant under *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).

## Summary of the Argument

There was insufficient evidence to support Mr. Morales's conviction because the record contains conclusive evidence of a reasonable doubt. No rational juror could have failed to have reasonable doubt of his guilt. See *Ervin v. State,* 331 S.W. 3d 49, 55 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *Jackson v. Virginia,* 443 U.S. 307, 318, n. 11, 317-19 (1979).

4

**Argument**

**A.    Standard of Review**

Evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011), citing *Jackson,* 443 U.S. at 319. The evidence is insufficient if it conclusively establishes a reasonable doubt. *Ervin v. State*, 331 S.W.3d 49, 55 (Tex. App.—Houston [1st Dist] 2010, no pet.)

If the evidence at trial raises only a suspicion of guilt, even a strong suspicion, then that evidence is insufficient. *Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010). "It is the obligation of the appellate courts to ensure evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Id.*

> Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus *impinges upon "jury" discretion* only *to the extent necessary to guarantee the fundamental protection of due process of law.*

*Jackson*, 443 U.S. at 319, (citation omitted)(emphasis added).

**B.    M.G.'s Testimony as to the Incident**

Whatever happened between Alex and M.G., it happened in a very small room in a 660 square-foot house (5 R.R. at 59). According to the Harris County Appraisal of

5

the house, from which the state quoted, the house contains a total of 5 rooms: two bedrooms and one bathroom; presumably the other two rooms are the living room and kitchen, though the appraisal does not specify. No dimensions other than the square footage of the house are shown. (HCAD appraisal attached as appendix.) The state guessed the living room was 12 feet by 10 feet; Alex said it was "long" (5 R.R. at 60).Twelve feet in width would be insufficient to accommodate a regular-sized sofa, a recliner, and a loveseat in the configuration described by both M.G. and Alex. The living room was more likely at least fifteen by eight or ten feet.

The following diagram was produced from an interior design site, and the furniture depicted is drawn to the scale of the 15' x 8' square foot dimensions of the room. They are the average sizes of regular sofa, recliner, and loveseat and are provided by the site. The diagram does not purport to be an exact replica and is included only to aid the Court in visualizing the scene.



Add to the room six children, ranging in age from one to 10 and one adult with his feet propped up on the recliner working on his laptop, and it becomes difficult to fathom the incident M.G. described having taken place without any of the others noticing, or without her crying out or struggling. But, assuming they were so enthralled with the toys or the movie that they failed to notice anything else, what is *impossible* to fathom is that a man in a recliner, with his feet up, working on a laptop, could somehow contort his body such that he could grab the belt loops of someone on the loveseat and get his hands into her vagina, with his feet still propped up and the laptop still on his lap.

M.G. testified that she was sitting facing the television (3 R.R. at 44. Even assuming Alex could reach her over the arm of the recliner, he would only be able to reach the side of her pants, without standing up. She said nothing about Alex getting up from the chair or putting his laptop down; in fact she demonstrated to the jury how he was sitting when she said he went into her pants with both hands (3 R.R. at 42-43). What she described is simply not physically feasible.

After M.G. testified on direct examination that Alex "went into her panties," the prosecutor asked her how he did that if she was wearing jeans, and the following exchange occurred:

A.    He tugged me.

Q.    He tugged you?

A.    Tried to pull me closer.

Q.    And what did he specifically – specifically what did he do with his hands?

A.    He went down my pants.

Q.    With what?

A.    His hands?

(3 R.R. at 50).

After showing M.G. a photograph of her with the CAC interviewer and ascertaining she is wearing the same jeans in the picture that she wore on the day of the alleged incident, the prosecutor asked:

8

Q.  Okay. So these pants you had, you said he – that you referred to as your Tio Alex, you said he was tugging at your pants. Were they kind of stretchy at the waist? Were they button up?

A.  Yes, sir.

Q.  Which one? Were they stretchy or –

A.  They buttoned up.

Q.  They buttoned up?

A.  Yes, sir.

Q.  So, were they loose fitting; or were they tight?

A.  They were loose fitting. They were loose fitting, about like in the middle kind of.

Q.  Sorry?

A.  They are kind of tight, but kind of loose.

Q.  Okay. Now, when he put his hands inside your pants and inside your panties, do you recall when he took his hands out if you had to button your pants back up?

A.  I had to pull them up a little bit.

Q.  You had to pull them back up?

A.  Because they were like slipping, I guess. Because I had a belt on. They were kind of big on me, so I had to pull them up.

(3 R.R. at 56).

During cross-examination, however, this interchange with defense counsel took place:

9

Q.  And did I understand you correctly that the jeans you're wearing in that picture are the same ones that you had on that day at Alex's house?

A.  Yes, sir.

Q.  And you said they had buttons?

A.  One button.

Q.  Is it the kind --

A.  One button just to button my pants.

Q.  Right. They had one button at the top and then the zipper?

A.  Yes, sir.

Q.  And you were also wearing a belt?

A.  No, I wasn't wearing a belt.

Q.  Okay. Did you say you were wearing a belt?

A.  I said I wasn't wearing a belt.

Q.  Oh, you didn't?

A.  Mr. Robinson asked me did I have to pull my pants up and down, and I said no. I said yes, I had a belt.
    I didn't have a belt. I said I didn't have a belt so I had to pull my pants up because they were loose.

Q.  You said you didn't have a belt?

A.  Yes, I said I didn't have a belt.

(3 R.R. at 102).

10

After M.G. described being on the loveseat and having Alex's hands penetrating her vagina, the prosecutor asked:

Q.    Now, prior to going into your pants, did anything else happen?

A.    He rubbed my arm.

Q.    And what do you mean he rubbed your arm?

A.    Like he rubbed it like that (indicating) by my shirt.

***

Q.    Now, as he rubs your arm, what does he do next?

A.    He stops.

Q.    Okay. And why does he stop?

A.    I don't know. I can't remember. Oh, I moved.

Q.    You moved.

A.    Yes, sir.

Q.    When you say you moved, what – what type of movement did you do?

A.    I scoot over.

Q.    Closer to him or –

A.    Far away from him.

(3 R.R. at 46-47).

The prosecutor then took her through the vaginal penetration story again, in more detail, then asked her:

Q.    So, M.G., now, you said the defendant – he is rubbing your arm?

11

A.    Yes, sir.

Q.    What happened next. Was that the end of everything?

A.    That was before the kids brought the toys out. And then the kids brought the toys out and I moved.

(3 R.R. at 50).

M.G. had testified earlier that she and some of "the kids" had started out sitting on the long couch when they came in to watch the movie (3 R.R. at 39). On being asked if she had ever moved from that couch, she replied that she moved when Isaiah, the infant, brought all the toys from Juliana and J.J.'s room and put them on the couch (3 R.R. at 39).

Q.    So, once he puts all the toys on the couch, was it just not enough room left?

A.    There wasn't. So, I had to move. Like I was squished on the couch.

(3 R.R. at 40).

A few minutes later, M.G. testified she had moved from the long couch to the small sofa on the other side of the recliner (3 R.R. at 42). So, either she "scooted" far away from Alex on the long couch, even though it was crowded with kids and toys, because she didn't like his rubbing her arm or she moved to the loveseat because there was no room on the long couch.

In either version, M.G. establishes that the long couch was just as close to the recliner as was the smaller one. She also testified that the other five children in the

12

room, some of whom were sitting on the long couch next to the recliner, were prevented from seeing what Alex was doing because his feet were "propped up" (3 R.R. at 68). Further, she explained:

A. They were distracted by the toys.

Q. So, Isaiah is playing with the toys. And what else is on?

A. The movie.

Q. Watching a movie.

A. And that's about it (3 R.R. at 69).

M.O.'s two children, Juliana and J.J. (Jeremiah), were ages 6 and 7 at the time of the visit to Alex's house. Mariah was about 6 (3 R.R. at 76, 127). G.G., Jr. was 4 (3 R.R. at 127). Isaiah was one (4 R.R. at 127).

Assuming the seat of the long couch is approximately level with that of the recliner, it is difficult to imagine that, at least the three older children would be unable to see over his propped up legs; they were sitting right next to him at more or less the same height. They would have been able to see over his legs. And he would have to have twisted his torso to face M.G. in order to get both hands into her pants.

Further, since M.G. claimed Alex had his feet up, working on his laptop, his grip on her belt loop would have been tenuous at best; it would have been easy for her to wriggle out of his reach. The record tells us nothing about what, if anything, she did or said to get free.

13

These details alone would conclusively establish reasonable doubt in a rational juror's mind but there is more.

## C.     The Outcry

According to both M.G. and Alex, Alex took all six children with him to pick up M.O. that afternoon from work (3 R.R. at 74, 4 R.R. at 49). M.G. did not tell M.O. that Alec had molested her because she "was scared and [ ] just didn't want to talk about it" (3 R.R. at 75). Shortly after they got back to the house, G.G., Sr. arrived (3 R.R. at 75, 4 R.R. at 49). M.G. was afraid to tell G.G. what had happened:

> Q.     Were you afraid of what he was going to do to you, or are you afraid –
>
> A.     To Alex. I was afraid that Alex was going to lie on me, and I was going to get in trouble for nothing I didn't do.

(3 R.R. at 75).

Her fear of getting into trouble would be consistent with Alex's testimony that he had pushed her away forcefully, called her a lazy ass, disrespectful kid, and said he would tell her father about her behavior (4 R.R. at 135, 5 R.R. at 31).

Alex and M.O. invited G.G., Sr. and the children to go Lakewood Church with them and they agreed (3 R.R. at 77). M.G. testified that she did not want to go but her little sister did and would make a fuss if M.G. told them she didn't want to go (3 R.R. at 77).

> Q.     And were you concerned that your dad may ask you why you didn't want to go?

14

A.    Yes, sir.

Q.    And why were you concerned about that?

A.    I don't know. Because I was really scared at that point. I didn't know what to do. And, so I was really afraid to tell my dad.

(3 R.R. at 77).

Or, she might have not wanted her father and Alex to be together outside of her presence because Alex might use the opportunity to tell on her, as he had threatened earlier. Alex testified that it was M.G., not Mariah, who actively wanted to go to Lakewood and she rode to church with Alex and M.O. (4 R.R. at 137). So did the other two girls and J.J. (3 R.R. at 79). The other boys rode with G.G., Sr. (3 R.R. at 79).

Eventually, after church, M.G. testified she rode with her father to a carwash and when he came back to the car she told him Alex had touched her (3 R.R. at 81).

Q.    So, you told him. What did you tell him?

A.    I told him Alex had touched me.

Q.    And did you tell him where Alex touched you?

A.    Yes, sir.

Q.    And did you describe the manner in which he touched you?

A.    No. I just told him that he touched me, and he was like: What? And I told him again, and he is like: Are you sure?

> And I said, like: Yes, sir.
> And he was like: Are you lying?
> I'm like: no sir.

(3 R.R. at 82).

15

G.G., M.G.'s father, testified as the outcry witness immediately after M.G.. After much questioning about his background and his relationship with Alex and M.O., the prosecutor brings him to the outcry and he directly contradicted what M.G. said she told him:

> Q.     And do you ask her to give you any type of detail about what happened?
>
> A.     Yes.
>
> Q.     And what is she able to tell you?
>
> A.     She told me that he tried to – he tried to touch her boobies, and he tried to touch her down there. And I asked her what: Do you mean down there? (*sic*)
>
>        And she said, in my vagina.
>
> Q.     And did she elaborate on what he touched her with?
>
> A.     His finger inside her.
>
> Q.     Did you ask her any questions to kind of –
>
> A.     Yes, I did. I asked her: Your clitoris or your lips or just the outside? Which one?
>
>        She said: No dad. He went inside my lips.

(3 R.R. at 155).

M.G. told her father that Alex had touched her inappropriately while they were at a carwash after church that evening (3 R.R. at 81). From the carwash, after G.G.

16

called Delfina, they went to pick her up from work and proceeded to Precinct 6 to report the alleged incident (3 R.R. at 82).

> Q. Okay. And so, did you talk to an officer out there that night?
>
> A. Yes, sir.
>
> Q. And when you talked to the officer, did you give him details of what had occurred earlier that day?
>
> A. I just told him that he touched me, and that's it, and like what before that and stuff. That's about it. I didn't go into detail.

(3 R.R. at 83).

Andres Guzman, the patrol officer at Precinct 6 with whom M.G. and her parents spoke, testified that he was loading up his patrol car to start his shift when G.G. and Delfina approached him at 1:00p.m (3 R.R. at 221). He spoke individually first to G.G., and then M.G. (3 R.R. at 224). He spoke to M.G. for 30 minutes to an hour (3 R.R. at 226). Contrary to M.G.'s testimony, the officer stated that M.G. provided him with a lot of detail in their conversation (3 R.R. at 226). However, he characterized the incident as "more of a contact-type-assault," which is why he did not send her for a rape kit (3 R.R. at 231). He said M.G. had told him that Alex had touched "the body parts of the complainant" (3 R.R. at 231).

> Q. And her body parts, were you referring to the female body parts?
>
> A. Yes, her private parts. And she said it.
>
> Q. Private parts?
>
> A. Yes.

17

Q. Did she – was she referring to what you believed to be her vaginal area?

A. Yes.

Q. Now, when someone is making a complaint against someone touching them, did she tell you what the defendant touched her with?

A. His hands.

(3 R.R. at 232).

Since G.G. spoke to Guzman before M.G., had M.G. really told G.G. the "details" he testified to, he surely would have told them to Guzman but Guzman did not hear about the penetration allegation until he reviewed the CAC interview to prepare for the trial (4 R.R. at 8-10).

Officer Guzman testified he found the CAC interview was consistent with what M.G. had told him (3 R.R. at 230); even though what he had seen and heard on the video made him realize M.G. was now alleging a different offense, penetration (4 R.R. at 9).

Q. But the statement she gave you that night, were they (*sic*) consistent with what she told Ms. Rogers?

A. Yes.

Q. So, it was just Ms. Rogers was able to get more detail from her.

A. Yes.

(4 R.R. at 10).

18

Certainly, it is impossible to penetrate without touching her, but this officer reported a touching, not a penetration. He reported a touching because that it what M.G. had told him. If G.G. had told him about Alex's finger having been in her vagina, he would have known to ask her the questions G.G. testified he asked her. He would not have viewed the incident as a mere touching.

Guzman's role was only to take the report, he referred the case Deputy Hudson at the precinct for investigation (3 R.R. at 233). Deputy Hudson testified that he had specialized training in dealing with child sex-abuse cases (4 R.R. at 20-21). Hudson reviewed Guzman's report and stated the report indicated M.G. had said Alex had touched her in her private area and her breasts (4 R.R. at 28-29).

Q.     So, he touched in the private area and the breast area?

A.     Yes, sir.

Q.     So, when you initially hear just the words "touched in the private area," what are you thinking as far as the criminal offense?

A.     I'm thinking that – like just – he had just touched her, inappropriately touched her.

(4 R.R. at 27-28).

The deputy then set up an interview with M.G. at the precinct. "After I talked to her and determined that her story was consistent as to the same as the report and the same thing she told Deputy Guzman, that's when I told the father: Okay. We need to make an appointment to have an interview at the CAC" (4 R.R. at 30). Hudson observed the interview at the CAC and testified that M.G. provided the interviewer with more

19

details than she had to Guzman, and presumably him, since he stated earlier that his interview with her at the precinct did not change his assessment of the case as a touching.

> Q. Now, how was she able to provide more detail?
>
> A. When the interviewer asked her about touching private areas, at that point she indicated that the suspect put –did it twice and he actually put his fingers in her vagina.
>
> ***
>
> Q. So, was this like something that she just volunteered; or did the interviewer have to kind of like ask questions to find out exactly what she meant by private area?
>
> A. Yes. The interviewers are trained to direct the questions to put the child at ease to get more details, and she asked specific questions as to what kind of touching and when – by "private area," did she understand what private areas and what areas it was okay for someone to touch (*sic*).

(4 R.R. at 31).

We are not told what led M.G. to say Alex penetrated her vagina with his fingers but during cross-examination of Deputy Hudson, defense counsel elicited from him that his report of the interview characterized this detail as a change of M.G.'s story that resulted in the Assistant District Attorney telling the deputy to schedule a forensic examination and rape-kit (4 R.R. at 60).

## Conclusion

The jurors were not given a picture of the room where M.G. claimed Alex molested her. They were unable to see the furniture in proportion to the size of the

room; they were not told the dimensions of the room. They were shown three photographs of the outside of the house (State's Exs. 2, 3, &11). They were told the room was small but just how small (3 R.R. at 38). The prosecutor skillfully kept their attention focused entirely on what Alex allegedly did to M.G., not on the fact that if it happened it happened in front of five other children

They heard G.G., Sr. lie on the stand about what M.G. told him had happened to her. The alleged "details" emerged several days later when she was interviewed by Tasha Rogers, who "elicited" them from her. They heard G.G. say he remembered the day well, yet he testified his youngest child, Ezekiel had not been born at the time. M.G. testified Ezekiel was in the car when G.G. and Delfino dropped her and the other children off at Alex's house.

They heard from Alex a reason that could explain why M.G. might have made a false allegation against him.

The state will no doubt argue that all the issues raised here are matters of credibility and weight of the evidence and reasonable inferences therefrom. But *Jackson* does not eliminate judicial review entirely from legal sufficiency analyses; it anticipates the possibility that some convictions will require appellate courts to impinge upon jury discretion "*to the extent necessary to guarantee the fundamental protection of due process of law.*" *Jackson*, 443 U.S. at 319, (citation omitted)(emphasis added).

This is one of those cases. This is a case requiring this Court to ensure that the evidence actually supports the conviction. *Winfrey v. State*, 323 S.W.3d 875, 882 (Tex.

Crim. App. 2010). It does not. No rational juror would conclude the state proved its case beyond a reasonable doubt.

"Reasonable doubt" is no longer defined for jurors. They are told things like: "[W]e do know from case law it's a very high standard. It's less than 100 percent, because the state could never prove anything to you a hundred percent unless you were there and saw it and then of course you would be a witness, not a juror…For some people I guess it might be 90 percent or some people 95 percent, for some people 99, whatever it is to you as long as it is a very high standard" (2 R.R. at 38).

But reasonable doubt was never meant to mean a percentage of the evidence presented by the state; it is about the quality of the doubt in the juror's mind, given the quality of the state's evidence. It is about whether one's doubt is reasonable in the face of what the state has shown them.

Jurors are also routinely, as in this case, shown a slide of an uncompleted puzzle depicting the outline of a gun. The prosecutor stated: "Notice all the puzzle pieces aren't filled in. This is beyond a reasonable doubt. You know based on seeing that without having all the pieces that this is a gun…. Basically it's a kind of common sense thing. You know it when you see it" (2 R.R. at 99). The puzzle analogy is inapt; whether a crime has been committed is far more complex than a puzzle showing a gun handle, trigger, and muzzle. The consequences of filling in gaps in the prosecution's story improperly, due to misunderstanding the evidence, for example,  or relying on

22

testimony of a child sex-abuse investigator to assess whether a witness is lying (4 R.R. at 43) are far too dire to trivialize in this fashion.

It defies reason that a man in his mid-forties, with no prior felonies, and only three very minor B misdemeanors—a man with grown children—an undocumented alien, with everything to lose-- would suddenly commit aggravated sexual assault of a child within mere feet of five other children, two of whom lived with him, and some of whom were nieces and nephews of his girlfriend's sister. And do so when the child's father is expected at any time to come and pick his children up from his house.

## Prayer

In view of the above, Alejandro Morales Calles, entreats this Court to recognize that the state's evidence conclusively raised reasonable doubt and find it legally insufficient. He asks the Court to reverse his conviction and render an acquittal.

Respectfully submitted,

**Alexander Bunin**
Chief Public Defender
Harris County Texas

/s/ *Melissa Martin*

_____

**Melissa Martin**
Assistant Public Defender
Harris County Texas
1201 Franklin, 13th floor
Houston Texas 77002

23

(713) 274-6709
TBA No. 24002532
Email: melissa.martin@pdo.hctx.net

## CERTIFICATE OF SERVICE

I certify that a copy of this brief was e-served to the Appellate Division, Harris County District Attorney located at 1201 Franklin, 6th Floor, Houston, TX 77002 and was also sent by first-class mail to Appellant.

*/s/ Melissa Martin*

_____

MELISSA MARTIN

## CERTIFICATE OF COMPLIANCE

Pursuant to proposed Rule 9.4(i)(3), undersigned counsel certifies that this brief complies with the type-volume limitations of *Tex. R. App. Proc. 9.4(e)(i)*.

1.      Exclusive of the portions exempted by *Tex. R. App. Proc. 9.4 (i)(1)*, this brief contains 4322 words printed in a proportionally spaced typeface.

2.      This brief is printed in a proportionally spaced, serif typeface using Garamond 14 point font in text and Garamond 12 point font in footnotes produced by Microsoft Word software.

3.      Upon request, undersigned counsel will provide an electronic version of this brief and/or a copy of the word printout to the Court.

4.      Undersigned counsel understands that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in *Tex. R. App. Proc. 9.4(j)*, may result in the Court's striking this brief and imposing sanctions against the person who signed it.

*/s/ Melissa Martin*

_____

**MELISSA MARTIN**