**MODIFY and AFFIRM; and Opinion Filed May 8, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-01416-CR

**ALEXDENAR ROBERSON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 1**
**Dallas County, Texas**
**Trial Court Cause No. F-1258374-H**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Whitehill
Opinion by Justice Francis

A jury convicted Alexdenar Roberson of the capital murder of his girlfriend's 20-month-old son. Because the State did not seek the death penalty, punishment is life in prison without parole. In two issues, appellant complains the evidence is insufficient to support his conviction and the reporter's record is incomplete, denying him a full and fair appeal. For reasons discussed below, we conclude both issues are without merit. Further, on our own motion, we modify the trial court's judgment to correct the spelling of appellant's first name and to reflect no possibility of parole. We affirm the judgment as modified.

At 3:20 p.m. on July 20, 2012, 911 received a call of an unconscious baby at a home on Cowan Street and dispatched Dallas Fire Rescue. DFR arrived at the scene at 3:25 p.m. at the same time as the child's mother, Precious Williams. The child, 20-month-old Trey Jenkins, was lying on a futon in the living room; he was not breathing. The paramedics started CPR but did

not get a response. When they asked questions to get the child's history, appellant kept saying he did not know what happened. Trey was transported to Children's Medical Center of Dallas, where medical workers attempted to revive him for about thirty minutes before pronouncing him dead.

Dr. Geetanjali Srivastav, the attending physician in the emergency room, testified the baby's mother told him the child did not have a medical history and she did not know what happened. He also spoke with appellant, who indicated he was alone with Trey when Trey became unresponsive. Appellant was the mother's boyfriend and father of her one-month-old daughter. Appellant told Srivastav "very matter of factly" that he was playing with the child when he suddenly "smelled stool." Appellant said he put the child on the ground to change his diaper and noticed "a lot of stool shooting out." Appellant looked at the child's face, saw blood in his mouth and nose, and noticed he was not responsive. Appellant said he started giving the child "breaths" and chest compressions. Appellant did not tell Srivastav that he had fallen on, stepped on, or tripped over Trey before he died. Srivastav said he had no information that explained why Trey had died.

Detective Kimberly Mayfield, who investigates child death cases for the Dallas Police Department, went to the hospital to speak to family members. When she arrived, appellant approached her and said he wanted to talk to her. During a ninety-minute interview, which was recorded and admitted into evidence, appellant detailed the events just before Trey died. According to appellant, Precious went to the grocery store and left him to watch Trey and their daughter, Aiyana. The three of them were in a back bedroom while appellant's brother and nephew, Julian (Chris) Roberson and Jevon Tipton, were cooking in the kitchen. Trey was fine, but shortly after Precious left, appellant said Trey had a "hissy fit." Appellant said Trey threw down his sippy cup, clenched his fist, and stomped his feet. Appellant told Trey to come to him

and, after initially balking, Trey went to him and gave him a "high-five." Appellant said he smelled a "boo-boo" and told Trey to lie on the ground so that he could change his diaper. As he was changing his diaper, "boo-boo" shot out and he was startled to see that Trey's nose was bleeding. Appellant elevated Trey's head to stop the bleeding and noticed Trey was "kind of gasping" for breath. Appellant immediately performed CPR, and when it did not work, he carried Trey to the kitchen and told Chris and Julian to call an ambulance. Appellant said he then carried Trey back to the bedroom and patted his back before carrying him to the front room and putting him on a futon. Appellant said he was performing CPR so aggressively that Jevon and his cousin, Cedric, pulled him off. Appellant estimated that five to seven minutes elapsed between the time Precious left the house and the ambulance arrived. He also told Mayfield that a couple of days earlier, Trey had run into a door frame while playing chase but was not injured. He never said he had stepped on, fell on, or tripped over Trey.

An autopsy was performed three days later, and Mayfield learned Trey died as a result of blunt force trauma. Because she did not understand all of the injuries as described by the medical examiner, Mayfield said she called Dr. Matthew Cox, director of the REACH Clinic at Children's Medical Center, to translate. After speaking with Cox, she understood the injuries and how long Trey could have survived. Based on the information she had, she knew appellant had sole care, custody, and control of Trey when he became symptomatic and that the injuries occurred in his care. Appellant was arrested, and Mayfield interviewed him a second time.

During this second interview, which was recorded and admitted into evidence, appellant again recounted how Trey threw a "hissy" fit and then became unresponsive as he was changing his diaper. However, he changed his story that he was alone with Trey in the bedroom after Precious left to go to the store. In this interview, he said Chris and Jevon (both adult men) came into the bedroom after Precious left and played with Trey and that Trey threw the fit within

seconds after they left the room. He also gave three other stories different from what he originally told Mayfield in which he recounted incidents to explain Trey's injuries as accidental.

First, he said that about twenty minutes before Precious left, he and Trey were going down the hallway outside the bedroom when Trey tripped. Appellant then tripped and landed on Trey's back with his shoulder. Appellant said he did not "fully fall" on him, and Trey cried a little but was fine. No one saw this incident.

Second, he told Mayfield that when he noticed something was wrong with Trey while changing his diaper, he was leaving the room to tell his brother to call an ambulance and realized he could not leave Trey alone. As he went to scoop him up, he tripped over Trey and stepped on his stomach. Mayfield told appellant she would present the information to the medical examiner, but she said she understood the injuries were from behind, not the front. She also explained that Trey had already stopped breathing at that point, so the injury had already occurred when he stepped on Trey.

His third story came after he indicated that he had suffered "black outs" on the previous days and had lost "memories." After thinking for several minutes, appellant recalled an incident in which he "fell on" Trey's back shortly before Trey became unresponsive. Appellant said he was lying on the bed, and Trey was lying on the floor nearby, on his belly, with his legs stretched out behind him and his head propped up in his hands, watching TV. The room was cluttered. As appellant got up from the bed, he did not look down, stumbled over some diaper boxes, and came down on Trey's back with his bare foot. He said he knew it was with "some force" but that he did not "stomp" on Trey. Trey "kind of cried" but got up "like it was nothing." Appellant said he stood Trey up, and a couple of minutes later, Trey threw the hissy fit.

Dr. William McClain, the medical examiner, performed the autopsy and testified Trey died as a result of blunt force trauma to the head and torso. An internal examination revealed

–4–

that Trey had thirteen rib fractures, and the jagged edges of the bones had broken into the chest cavity and shredded areas of the lungs. Trey's liver was torn almost into two pieces, and his kidney and adrenal gland had been dislodged and were "more or less free in the abdominal cavity." He said a "rather large percentage" of Trey's blood volume, 210 milliliters, was in Trey's chest and abdominal cavities. He also noted a variety of bruises to the collarbone area as well as two older, healing rib fractures. McClain explained that it is difficult to fracture a child's ribs because their ribs have a lot of cartilage and are "very springy and elastic."

McClain testified that anyone, adult or child, with the injuries sustained by Trey, would be immediately symptomatic and it would be obvious to anyone around him. According to McClain, a child would have exhibited symptoms of crying, whimpering, or loud screams instantaneously. After a few seconds, especially with the liver injury and the amount of blood lost into the abdominal cavity, he said a child would be lethargic, not moving much, and laying down. With the injuries to the lungs, a child might be unable to let out a loud cry because he would be unable to move air in and out of his lungs. Instead, he might whimper, attempt to breathe, or gasp for breath. McClain further explained that with the injuries Trey sustained, he could have died within a minute or two or he could have survived for as long as five to seven minutes. He also agreed that "depending on which injuries were inflicted on the child," it is possible a child could live ten minutes. McClain said, in his opinion, after receiving the injuries, Trey could not have been running around, giving a "high five," throwing a sippy cup, or stomping his feet. Further, he said the injuries were not the type received by tripping or stepping on someone one time because there were "multiple impact sites." Nor were they consistent with someone performing aggressive CPR. The injuries were, however, consistent with an adult grabbing the child by the neck, throwing the child on the floor, and stomping and kicking him

several times. McClain said he was not able to determine how the injuries were caused except that it was blunt force to the body, mostly to the back.

Several other witnesses testified at trial, including Trey's mother, Precious. Precious said appellant was not Trey's father but was the father of her daughter, Aiyana, who was one month old when Trey died. Precious said she began dating appellant when Trey was three or four months old and appellant ultimately dropped out of school to help her take care of him. She said appellant treated Trey as his own biological son.

On the day of Trey's death, Precious asked appellant's cousin, Julius, to take her to the grocery store. She left Trey and Aiyana in the bedroom with appellant, and Trey was healthy when she left. She estimated it took about five minutes to get to the store. While there, she got a call that Trey was not breathing and she rushed home, estimating it took only two to three minutes. A recording admitted into evidence showed Precious enter the grocery store at 3:05 p.m., receive a call at 3:18 p.m. while in the check-out lane, and immediately leave the store. Precious said she arrived home at the same time as the paramedics. Trey was lying on the futon, and appellant was crying and saying he did not know what happened. Appellant never told her he tripped over or stepped on Trey while she was gone.

Appellant's nephew, Jevon, testified that at the time of Trey's death, he lived at the house with appellant, Precious, Trey, Aiyana, and appellant's brother, Chris. He saw Trey early on the morning of the day he died but did not see him again until after he was unresponsive. Both he and Chris were in the kitchen when appellant ran in screaming to call an ambulance. Jevon ran outside and called for his neighbor, Cedric Sheffield, to help. He then called Julius, who had taken Precious to the grocery store, and told him Trey was not breathing. When he went back into the house, Chris was calling 911 and trying to calm appellant. Jevon said he saw both

appellant and Cedric perform CPR on Trey. Jevon said he did not play with Trey after Precious left for the store.

Like Jevon, Chris denied playing with Trey after Precious left for the store. Chris said he did not see Trey that day until appellant came running into the kitchen with him. Chris said he initially "flipped out" but then calmed down and started to perform CPR. Chris estimated appellant was in the back bedroom with Trey seven to ten minutes after Precious left, but he acknowledged he had previously testified it was ten minutes. He also said he found it "odd" that Precious went to the grocery store because he had just gotten back from the store and because appellant did the grocery shopping. Finally, members of appellant's family told the jury they had seen Precious hit or "punch" Trey like he was a ten-year-old. They also said appellant cared for Trey and treated him like his own son.

In his first issue, appellant argues the evidence is insufficient to support his conviction. In particular, he argues a "faulty timeline" developed by the police excluded them from considering the mother as a suspect. He asserts the medical examiner's testimony, along with other evidence, supports that Precious committed the offense, not him.

In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772,778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* Direct and circumstantial evidence are treated equally. *Id*

A person commits the offense of capital murder if he intentionally or knowingly causes the death of a child under ten years of age. *See* TEX. PENAL CODE ANN. § 19.03(a)((8) (West Supp. 2014). It is the obligation and responsibility of the appellate courts "to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010); *Mayo v. State*, 238 S.W.2d 777, 778 (Tex. Crim. App. 1951) (explaining State has burden of proving beyond a reasonable doubt that accused was person who committed offense charged).

In his brief, appellant asserts the police assumed appellant caused the injuries to Trey because Precious was at the grocery store when appellant "first noted" the injuries. However, he asserts the medical examiner previously testified the child "would have been symptomatic and die[d] within seven to ten minutes of the infliction of the injuries" and that appellant told the police Trey stopped breathing five to seven minutes after Precious left.[1] He further asserts Precious was alone with the child prior to leaving for the grocery store and witnesses said she had a history of beating Trey.

Appellant's argument focuses on whether Trey could have lived for ten minutes after suffering the injuries and whether Precious had been gone for less than that amount of time when Trey died. Irrespective of whether Trey could have lived for one minute or ten minutes, Dr. McClain testified that Trey would have been immediately symptomatic given the injuries he sustained and that it would have been obvious to anyone. According to McClain, Trey would have been whimpering, attempting to breathe, or gasping for breath once his lungs were injured because he would not have been able to move air in and out of his lungs, and, in fact, appellant testified that Trey was gasping for breath as he was changing his diaper and then became

---

[1] In his brief, appellant asserts that he told the police Precious had been gone for five to seven minutes when the child stopped breathing. The citation to the recording, however, shows the question he answered was how long Precious was gone before the ambulance arrived.

unresponsive. McClain testified Trey could not have been playing, running around, giving "high-fives," throwing his cup, or stomping his feet once these injuries occurred. Although appellant's defensive theory is that Precious was to blame, the evidence does not support that theory. The evidence showed Trey was healthy when Precious left for the store. The timeline shows that Precious arrived at the grocery store at 3:05 and received the call about Trey at 3:18. The 911 call for help was made at 3:20 p.m., after Precious had been gone for more fifteen minutes. Given the medical examiner's testimony that Trey would have been immediately symptomatic, the jury could have believed beyond a reasonable doubt that appellant was the only person who could have inflicted the injuries. We overrule the first issue.

In his second issue, appellant asserts the reporter's record is incomplete because it does not include the bench conference discussions. Appellant asserts that before trial, he requested the court reporter to record bench conferences. In his brief, appellant requested this Court to abate the appeal to determine whether there is a record of any bench conferences. Appellant acknowledged that if no bench conferences were recorded, he has waived any complaint by failing to object. *See Valle v. State*, 109 S.W.3d 500, 508–09 (Tex. Crim. App. 2003) (concluding that even if party requested before trial that bench conferences be recorded, party must still object to failure to record such conferences to preserve error). As requested, this Court abated the appeal. After conducting a hearing, the trial court made findings that no bench conferences were recorded by the court reporter during the course of the proceedings. Because the record does not show appellant objected to the court reporter's failure to record the bench conferences, any error is waived. *See Valle*, 109 S.W.3d at 508–09.

Finally, although neither party has raised the issue, our review of the record reveals two errors in the trial court's judgment. First, the judgment identifies appellant as "Alexander Roberson" while other documents in the clerk's record list his first name as either Alexander,

Alexdener, or Alexdenar. At trial, State's Exhibit 8 and 9, the consent to search and Miranda warnings card, were admitted into evidence. Appellant signed both documents as Alexdenar. Additionally, in his interview with police, appellant spelled out his name as "A-l-e-x-d-e-n-a-r." Consequently, the record shows the spelling of appellant's first name is Alexdenar.

Second, the judgment reflects the punishment as life, not life without parole. Appellant was convicted of capital murder of a child under ten years old. *See* TEX. PENAL CODE ANN. § 19.03(a)(8). A person convicted of a capital felony in a case where the State does not seek the death penalty shall be imprisoned in TDCJ for life without parole if the person who committed the offense is 18 years of age or older. *Id.* § 12.31(a)(2) (West Supp. 2014). Here, the indictment shows appellant's birthday is March 10, 1994, and the record shows the offense was committed on July 20, 2012. Further, appellant told Detective Mayfield on the night of the offense that he was eighteen. Because appellant was eighteen years old when he committed the offense and the State did not seek the death penalty, punishment is automatically life in prison without parole. *Id.*

We have the authority to correct a judgment below to make the record "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the trial court's judgment to reflect (1) appellant's first name is Alexdenar and (2) punishment is life without parole.

We affirm the judgment as modified.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

131416F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ALEXDENAR ROBERSON, Appellant

No. 05-13-01416-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 1, Dallas County, Texas
Trial Court Cause No. F-1258374-H.
Opinion delivered by Justice Francis; Justices Lang-Miers and Whitehill participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

(1) to correct the spelling of appellant's first name to Alexdenar and (2) to reflect punishment as life without parole

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 8th day of May, 2015.