# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | DIVISION ONE |
| --- | --- |
| Respondent, | No. 80522-3-I |
| v. | UNPUBLISHED OPINION |
| ENCARNACION SALAS IV, | |
| Appellant. | |

DWYER, J. — Encarnacion Salas appeals from his conviction of murder in the second degree with a deadly weapon. Salas contends that the trial court erred by (1) not instructing the jury sua sponte that he had no duty to retreat, (2) admitting certain evidence in violation of ER 404(b), and (3) admitting certain testimony that generally regarded dog tracking. Salas also asserts that the prosecutor violated his due process right to a fair trial by eliciting "misleading" testimony and making a false argument to the jury. Finally, Salas avers that the trial court mistakenly ordered him to pay supervision fees to the department of corrections. We remand the judgment for the trial court to strike the requirement that Salas pay supervision fees. In all other respects, we affirm.

I

Salas lived in a unit of an apartment complex with his two aunts, Ruby and Cristal Salas. Jesus Lopez lived with his mother, Antonia Lopez, in the same apartment complex. According to trial testimony, Salas and Lopez became

friends and spent time together. They enjoyed drinking alcohol, smoking marijuana, talking, and watching television shows. After some time, their relationship became, in Salas's words, "kind of homosexual." Salas described a time around August 2014 when Lopez made a sexual advance. Salas informed Lopez that he was "uncomfortable with that" and "not ready."

Salas owned several knives and hatchets. He frequently carried a knife with him. Sometime in August 2014, Salas purposefully cut his own face with a knife because he felt conflicted about his sexuality and relationship with Lopez.

Around 9:00 p.m. on October 24, 2014, Lopez sent several text messages to Salas asking whether he wanted to drink alcohol. Salas went to Lopez's apartment and the two began consuming alcohol. Salas brought a backpack, which contained alcohol and a knife. Lopez and Salas had, on occasion, played with the knife. They would "sometimes twirl it, spin it around." Salas and Lopez listened to music for a couple of hours.

Salas testified that, at one point during the evening, Lopez "made a pass" at him. Salas told Lopez that he was "uncomfortable" and "not ready for that step in the relationship." Thereafter, Salas and Lopez "maintained a little distance," and Salas continued to drink. Salas and Lopez subsequently went onto the balcony of the apartment where Lopez grabbed Salas's genital area. Salas repeated his reservations, but this time did so "more aggressively." According to Salas, Lopez then "hit" him with the knife. Salas stated that he reacted by hitting Lopez against the door. Salas then retrieved the knife from Lopez. Salas

2

testified that he and Lopez started "wrestling" on the balcony. Salas then stabbed Lopez "a couple times" with the knife.

Antonia Lopez was present that evening. She testified that she "heard something" and exited her bedroom. Antonia stated that she saw Lopez at the door of the balcony where he was "holding himself up on the border of the door." Her son was "bleeding a lot." Salas was standing on the balcony and "was trying to pull" Lopez out onto the balcony.

Salas testified that, while Lopez was standing at the door of the balcony, Salas was "trying to go in, and pushing him, and he's pushing back." Salas had the knife in his hand. At this moment, Salas knew that Lopez did not want him to enter or remain at the apartment:

> [The State]: And at the point whereby [Lopez]'s got his hand up against the wall, was trying to prevent you from pulling him onto the balcony, and why are you doing that? He's trying to get away from you.
> [Salas]: I don't believe he was doing that. I think he was -- I was trying to come in and he was there.
> [The State]: You were trying to come in and he was there?
> [Salas]: The apartment.
> . . . .
> [The State]: So you say you have the knife. He's keeping you from coming back into the house. Why don't you just leave the balcony then?
> [Salas]: It didn't occur to me at the time.
> [The State]: *So he doesn't want you in his house at that point?*
> [Salas]: *Correct.*

(Emphasis added.)

According to Salas, "the next thing I know, we're inside." Once they were inside, Salas kicked Lopez, punched Lopez, and "push[ed] the knife in his direction." Lopez did not get control of the knife. The struggle persisted into the

3

dining room and kitchen.  According to Salas, he knocked Lopez to the floor and noticed blood coming from Lopez's neck.  He stated that he "applied pressure" to stop the bleeding.  Salas saw "blood everywhere."  Lopez was not moving.

Antonia's recollection differed from Salas's testimony.  She testified that, when Salas and Lopez were inside of the apartment, she pulled Lopez away from Salas.  She then leaned Lopez against the kitchen bar.  Salas went to the front door and put on his backpack and shoes.  Antonia did not notice any injuries to Salas.

According to Antonia, Lopez then fell to the floor.  Lopez pleaded, "Mother, help me, I'm dying."  Salas then "grabbed something" from his backpack and "jumped on" Lopez.  From Antonia's perspective, Salas was "cutting him" and "doing something to his neck."  Antonia pulled on Salas's ears and "squeezed his nose really hard."  Salas then "took off" and left the apartment via the balcony. Antonia locked the balcony door.

Looking back at Lopez, Antonia knew that he was dead "because there was blood everywhere."  Antonia left the apartment and asked several neighbors for help.  Shortly thereafter, police officers arrived.

Lopez had extensive injuries.  These included (1) four stab wounds on the side of his chest, (2) two stab wounds on his upper chest, (3) several incise wounds on the neck, one of which went "into the yellow, fatty tissue beneath the skin" and two of which "severed the external left jugular vein," and (4) an incise wound on the chin that went "to the surface of the . . . jaw bone."

Salas spent the night in the woods, where he remained for approximately 14 hours. A police-led dog track of Salas was unable to locate him. The next day, Salas returned to his apartment. Once there, he showered and treated a wound on his arm. He began to gather his belonging to "go to the mountains." However, a neighbor telephoned the police to report that Salas was at the apartment. Police officers soon arrived at the apartment and arrested Salas.

The State charged Salas with murder in the first degree with a deadly weapon, "to wit: knife." The case proceeded to a jury trial. Ultimately, the jury did not reach a verdict on the charge of murder in the first degree, but did find Salas guilty of murder in the second degree with a deadly weapon. On appeal, we reversed on the bases of prosecutorial misconduct and ineffective assistance of counsel. State v. Salas, 1 Wn. App. 2d 931, 953, 408 P.3d 383 (2018).

On remand, the case proceeded to trial again. Again, the jury did not reach a verdict on the charge of murder in the first degree, but found Salas guilty instead of murder in the second degree with a deadly weapon. The trial court imposed a sentence of 244 months of incarceration.

Salas appeals.

II

Salas presented a defense of self-defense. On appeal, he asserts that the trial court erred by not providing a no-duty-to-retreat instruction sua sponte. According to Salas, the absence of a no-duty-to-retreat instruction gives rise to a manifest error affecting a constitutional right. We disagree.

5

Salas did not request a no-duty-to-retreat instruction at trial.

Nevertheless, he claims that he was entitled to the following instruction:

> It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that [he] [she] is being attacked to stand [his] [her] ground and defend against such attack by the use of lawful force. The law does not impose a duty to retreat.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL

16.08 (4th ed. 2016).

Salas's claim of error fails for three reasons. First, we have already held

that error cannot be assigned to a trial court for not giving an unrequested no-

duty-to-retreat instruction:

> [Defendant] . . . argues that the court erred in failing to instruct the jury that he had no duty to retreat. But, he never requested that instruction and does not cite any case that would require the trial court to give it *sua sponte*. In fact, the Washington Supreme Court has held that when a party fails to request an instruction, it "cannot predicate error on its omission."

State v. Lucero, 152 Wn. App. 287, 292, 217 P.3d 369 (2009) (quoting McGarvey

v. City of Seattle, 62 Wn.2d 524, 533, 384 P.2d 127 (1963)), rev'd on other

grounds, 168 Wn.2d 785, 230 P.3d 165 (2010).

Second, Salas unconvincingly asserts that he was entitled to a no-duty-to-

retreat instruction because, without it, the law of self-defense was not manifestly

apparent to the average juror. In support of this argument, he cites to State v.

Ackerman, 11 Wn. App. 2d 304, 309, 453 P.3d 749 (2019), in which we

explained that a "trial court erred by giving instructions that failed to make the

self-defense standard manifestly apparent to the average juror." However,

in Ackerman, we stated that "[w]e analyze unpreserved claims of error regarding

6

self-defense instructions on a case-by-case basis to determine whether they constitute a manifest constitutional error." 11 Wn. App. 2d at 309. As such, here we must analyze the instructions that were actually given by the trial court in order to determine whether those instructions made the relevant legal standard manifestly apparent. Ackerman, 11 Wn. App. 2d at 312. Contrary to Salas's contention, Ackerman does not stand for the proposition that a defendant is always entitled to assign error to a self-defense instruction that he or she did not request.

Finally, based on the evidence in the record and the applicable legal standard, a no-duty-to-retreat instruction was not warranted in this case. Generally, we will not consider an issue raised for the first time on appeal. RAP 2.5(a). However, a claim of error may be raised for the first time on appeal if it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). "'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). When determining whether an error is manifest,

> [i]t is not the role of an appellate court on direct appeal to address claims where the trial court could not have foreseen the potential error or where the prosecutor or trial counsel could have been justified in their actions or failure to object. Thus, to determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error.

State v. O'Hara, 167 Wn.2d 91, 100, 217 P.3d 756 (2009).

Here, the evidence in the record did not support a no-duty-to-retreat instruction. Indeed, Salas testified that he knew that he no longer had permission to remain at Lopez's apartment prior to killing Lopez:

> Q. And at the point whereby [Lopez]'s got his hand up against the wall, was trying to prevent you from pulling him onto the balcony, and why are you doing that? He's trying to get away from you.
> A. I don't believe he was doing that. I think he was -- I was trying to come in and he was there.[1]
> Q. You were trying to come in and he was there?
> A. The apartment.
> . . . .
> Q. So you say you have the knife. He's keeping you from coming back into the house. Why don't you just leave the balcony then?
> A. It didn't occur to me at the time.
> Q. *So he doesn't want you in his house at that point?*
> A. *Correct.*

(Emphasis added.)

In other words, even viewed in the light most favorable to Salas, his own testimony demonstrates that his license to remain at Lopez's apartment had been revoked and that he was aware of this.[2] Yet "[a] defendant is entitled to a no duty to retreat instruction when evidence supports a finding that the defendant was assaulted in a place where the defendant was *lawfully entitled to remain*." State v. Williams, 81 Wn. App. 738, 742, 916 P.2d 445 (1996) (emphasis added). Given the evidence in the record and the applicable legal standard, the trial court could not have reasonably given a no-duty-to-retreat

---

[1] On direct examination, Salas testified, "I'm trying to go in, and pushing him, and he's pushing back, and the next thing I know, we're inside."

[2] See Conaway v. Time Oil Co., 34 Wn.2d 884, 893, 210 P.2d 1012 (1949) ("A license authorizes the doing of some act or series of acts on the land of another . . . and justifies the doing of an act or acts which would otherwise be a trespass."); Proctor v. Huntington, 146 Wn. App. 836, 852, 192 P.3d 958 (2008) ("[A] license is revocable . . . and created by the licensor's oral, written, or implied consent."), aff'd, 169 Wn.2d 491, 238 P.3d 1117 (2010).

instruction. Salas fails to establish that he was prejudiced. Thus, there is no manifest error.

Accordingly, Salas's assignment of error fails.

III

Salas next contends that the trial court erred by admitting evidence that he cut his own face approximately two months before the incident in dispute. This is so, he asserts, because the evidence should have been excluded pursuant to ER 404(b). We disagree.

We review the trial court's evidentiary decisions for abuse of discretion. State v. Bajardi, 3 Wn. App. 2d 726, 729, 418 P.3d 164 (2018). A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons. State v. Taylor, 193 Wn.2d 691, 697, 444 P.3d 1194 (2019).

As a general rule, "[a]ll relevant evidence is admissible." ER 402. ER 404(b) provides an exception to this general rule:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As a noted scholar has explicated, "Rule 404(b) expresses the traditional rule that prior misconduct is inadmissible to show that the defendant is a dangerous person or a 'criminal type' and is thus likely to have committed the crime for which he or she is presently charged." 5D KARL B. TEGLAND, WASHINGTON PRACTICE: COURTROOM HANDBOOK ON WASHINGTON EVIDENCE

§ 404:7 (2019 ed.). The policy behind this rule is that, "[b]ecause of the State's burden of proof in a criminal case, the law is uncomfortable with the notion of once a criminal, always a criminal." 5D TEGLAND, supra, § 404:8. Indeed, we have previously explained that "ER 404(b) prohibits evidence of prior acts to prove the defendant's propensity to commit the charged crime." State v. Cook, 131 Wn. App. 845, 849, 129 P.3d 834 (2006), abrogated on other grounds by State v. Magers, 164 Wn.2d 174, 189 P.3d 126 (2008).

Although the traditional rule is primarily concerned with evidence of the defendant's prior *misconduct*, our Supreme Court has determined that the "acts" contemplated by ER 404(b) are not necessarily limited to misconduct. Instead, the "'acts' inadmissible under ER 404(b) include any acts used to show the character of a person to prove the person acted in conformity with it on a particular occasion." State v. Everybodytalksabout, 145 Wn.2d 456, 466, 39 P.3d 294 (2002).

In that case, "the trial court permitted the State to introduce the testimony of [a police officer] that . . . [the officer] often saw [the defendant] and [the co-defendant] together . . . and that [the defendant] would usually carry conversations with the officer while [the co-defendant] stood back or walked away." Everybodytalksabout, 145 Wn.2d at 462-63. The State then "relied upon that testimony to establish that [the defendant] was liable as an accomplice" to a murder. Everybodytalksabout, 145 Wn.2d at 465.

Our Supreme Court explained that the evidence of the defendant's prior acts was inadmissible propensity evidence under ER 404(b) because the

evidence was admitted to establish a trait of the defendant's character in order to prove that he acted in conformity with that trait of character in committing the crime charged:

> Although [the defendant's] prior "acts" about which the detective testified were not misconduct, unpopular or disgraceful, they were offered to show his qualities of leadership; that he acted in conformity with those qualities at the time [the victim] was killed; and he therefore somehow participated with [the co-defendant] in killing [the victim]. The evidence is inadmissible under ER 404(b).

Everybodytalksabout, 145 Wn.2d at 468.

It is well-established that the purpose of ER 404(b) is to prevent the introduction of evidence to establish the character of the defendant in order to prove that the defendant had a propensity to commit the crime charged or is otherwise a bad person. Indeed, in referring to Federal Rule of Evidence 404(b),[3] Judge Richard Posner explained:

> The aim of the rule is simply to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person, implying that the jury needn't worry overmuch about the strength of the government's evidence. No other use of prior crimes or other bad acts is forbidden by the rule, and the draftsmen did not try to list every possible other use.

---

[3] "'Where a state rule parallels a federal rule, analysis of the federal rule may be looked to for guidance' in interpreting the state rule." Washburn v. City of Federal Way, 178 Wn.2d 732, 750, 310 P.3d 1275 (2013) (quoting Beal v. City of Seattle, 134 Wn.2d 769, 777, 954 P.2d 237 (1998)). Fed. R. Evid. 404(b) is analogous to ER 404(b):
> **Other Crimes, Wrongs, or Acts.**
> **(1) Prohibited Uses.** Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> **(2) Permitted Uses.** This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.
> Thus, Washington courts have analyzed federal case law concerning Fed. R. Evid. 404(b) in order to interpret ER 404(b). See, e.g., State v. Arrendondo, 188 Wn.2d 244, 261, 394 P.3d 348 (2017); State v. Norlin, 134 Wn.2d 570, 580-81, 951 P.2d 1131 (1998); State v. Donald, 178 Wn. App. 250, 258-64, 316 P.3d 1081 (2013).

11

United States v. Taylor, 522 F.3d 731, 735-36 (7th Cir. 2008) (citation omitted).[4]

Here, the State elicited testimony from Salas that he had purposefully cut

his own face with a knife approximately two months before killing Lopez:

Q.   Okay.  And this?
A.   What about it?
Q.   On your face.
A.   Yes.
Q.   That happened in August?
A.   Yes.
Q.   Did you do that to yourself?
A.   I did.
Q.   Why?

---

[4] Other federal appellate courts are in agreement.  Indeed, the Ninth Circuit Court of Appeals has opined:

> The Federal Rules of Evidence start from the proposition that "[a]ll relevant evidence is admissible."  Fed. R. Evid. 402.  Rule 404(b) makes an exception for "[e]vidence of other crimes, wrongs, or acts" where that evidence "prove[s] *only* criminal disposition."  *United States v. Rocha*, 553 F.2d 615, 616 (9th Cir. 1977).  But we have held that Rule 404(b) is "one of inclusion," and if evidence of prior crimes bears on other relevant issues, 404(b) will not exclude it. *Id*.

United States v. Cruz-Garcia, 344 F.3d 951, 954 (9th Cir. 2003); see also United States v. Donovan, 984 F.2d 507, 512 (1st Cir. 1993) ("Rule 404(b) is a rule 'of inclusion which allows the introduction of evidence of other crimes, wrongs, or acts unless the evidence tends to only prove criminal disposition.'" (quoting United States v. Fields, 871 F.2d 188, 196 (1st Cir. 1989))); United States v. Dupree, 870 F.3d 62, 76 (2d Cir. 2017) ("Under our Circuit's 'inclusionary approach,' prior act evidence is admissible if offered 'for any purpose other than to show a defendant's criminal propensity.'" (internal quotation marks omitted) (quoting United States v. Mejia, 545 F.3d 179, 206 (2d Cir. 2008))); United States v. Green, 617 F.3d 233, 249 (3d Cir. 2010) ("[T]he purpose of Rule 404(b) is 'simply to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person'" and "'[n]o *other use* of prior crimes or other bad acts is forbidden by the rule'" (quoting Taylor, 522 F.3d at 735-36)); United States v. Siegel, 536 F.3d 306, 317 (4th Cir. 2008) ("'Rule 404(b) is viewed as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition.'" (quoting United States v. Young, 248 F.3d 260, 271 (4th Cir. 2001))); United States v. Johnson, 439 F.3d 884, 887 (8th Cir. 2006) ("Rule 404(b) is . . . 'a rule of inclusion rather than exclusion and admits evidence of other crimes or acts relevant to any issue in the trial, unless it tends to prove only criminal disposition.'" (quoting United States v. Simon, 767 F.2d 524, 526 (8th Cir. 1985))); United States v. Merritt, 961 F.3d 1105, 1111 (10th Cir. 2020) ("Rule 404(b) admits 'all evidence of other crimes or acts except that which tends to prove *only* criminal disposition.'" (quoting United States v. Brooks, 736 F.3d 921, 939 (10th Cir. 2013))).

The policy behind Fed. R. Evid. 404(b) is summarized within the advisory committee's notes:

> "Character evidence is of slight probative value and may be very prejudicial.  It tends to distract the trier of fact from the main question of what actually happened on the particular occasion.  It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."

Johnson, 439 F.3d at 887 (quoting Fed. R. Evid. 404 advisory committee notes (1972)).

A. When we attempted that relationship kind of messed with me, and thinking to myself, you know, what are you doing? Or, dude, you should be, like, with a woman or something. I was drunk, all that's just running through my mind, and I end up cutting myself.

Q. With your knife?

A. With one of my knives, yes.

Q. Okay. So you were really conflicted about this?

A. Yes.

Q. And [Lopez], was he at the source of that?

A. He was the source, but not the cause. I make decisions.

Q. Okay. And you were so conflicted about it, so upset about it that you did that to your face?

A. I did.

During closing argument, the State referenced this testimony in order to persuade the jury to conclude that Salas was willing to cut his own arm after murdering Lopez in order to have evidence in support of his claim of self-defense:

> Maybe ask yourself, well, how did [the cut on Salas's arm] occur and who caused [it]? The defendant. The defendant cut his own arm. Just like he cut his own face.

In a pretrial ruling, the trial court determined that ER 404(b) did not preclude the evidence from being admitted:

> THE COURT: Actually, if you take a look at [Section] 404:7 in Tegland's, it . . . says [ER] 404(b) expresses the traditional rule that prior misconduct is inadmissible to show that the defendant is a dangerous person or a criminal type and is thus likely to have committed the crime for which he or she is presently charged.
> . . . .
> THE COURT: In other words, the defendant's misconduct not charged in the present case is not admissible to demonstrate the defendant's general propensity for misconduct.
> So this does not appear to be the type of misconduct that's contemplated at all by the rule, and it's certainly not for purposes of showing his propensity to engage in criminal activity because it's not a criminal activity. And so that's what, at least, Tegland's references.

At this point I'm going to deny the motion to exclude the evidence.

The trial court incorrectly determined that ER 404(b) applies only to misconduct. See Everybodytalksabout, 145 Wn.2d at 466. However, the trial court correctly determined that the evidence that Salas had cut his own face was not excluded by ER 404(b) because it was not being introduced for the purpose of showing his propensity to engage in criminal activity. See, e.g., Donovan, 984 F.2d at 512 ("Rule 404(b) is a rule 'of inclusion which allows the introduction of evidence of other crimes, wrongs, or acts unless the evidence tends to only prove criminal disposition.'" (quoting Fields, 871 F.2d at 196)).

Here, the evidence that Salas had previously cut his own face was not designed to prove Salas's character or that he had a propensity to commit the crime charged. Indeed, the State did not use this evidence to argue that, because Salas had cut his own face, he possessed a certain character trait— such as violence or aggression—and acted in conformity with that character trait by murdering Lopez. Instead, the State proffered the evidence to show that Salas was willing and mentally capable of inflicting pain upon himself *after* he had already killed Lopez.

This evidence was properly used to rebut the natural presumption that people ordinarily do not willingly inflict pain upon themselves. In support of his self-defense theory, Salas argued that Lopez had inflicted the cut on his arm. A juror might naturally believe that a serious knife wound on an arm would be caused by the other person involved, not by the person who suffered the wound. However, evidence of Salas's willingness to inflict a knife wound on himself gave

14

a more complete picture of the situation. Coupled with the 14-hour period during which he disappeared and after which he possessed the wound, the jury was faced with a reasonable factual alternative to Salas's self-defense narrative. Accordingly, ER 404(b) did not preclude the admission of the evidence.

IV

Salas next asserts that the trial court erred by admitting testimony regarding dog tracking. According to Salas, this testimony was inadmissible because it was irrelevant, failed to satisfy certain foundational requirements, and violated a pretrial ruling regarding the disclosure of expert testimony. We disagree.

Again, we review the admission of evidence by a trial court for abuse of discretion. State v. Redmond, 150 Wn.2d 489, 495, 78 P.3d 1001 (2003). However, on appeal, a party may not advance a claim of evidentiary error that was not properly preserved at trial. State v. Powell, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). "We adopt a strict approach because trial counsel's failure to object to the error robs the court of the opportunity to correct the error and avoid a retrial." Powell, 166 Wn.2d at 82. "The appellant may assign error in the appellate court only on the specific ground of the evidentiary objection made at trial." State v. Henson, 11 Wn. App. 2d 97, 102, 451 P.3d 1127 (2019) (citing Powell, 166 Wn.2d at 83). Indeed, "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike is made, stating the specific ground of objection." ER 103(a)(1).

15

During the trial, Detective Ted Betts, a former "accredited K-9 deputy," testified generally about dog tracking. He did not testify about the particular dog track that was performed during the investigation of this case. When Detective Betts was asked about the "environmental factors" that a K-9 detects during a dog track, Salas objected on the ground of relevancy:

> Q. Sure. Are there environmental factors -- first off, what does a K-9 detect when you're doing a K-9 track?
> [DEFENSE COUSNEL]: I guess I'm going to object to relevance at this point, Your Honor.
> THE COURT: Overruled on that basis.

Detective Betts then described a K-9's capability to detect scents as well as certain environmental factors that may have an impact on that ability. On appeal, although Salas did not interpose an objection at trial to the following testimony, he asserts that it was also irrelevant:

> Q. And, Detective, one last question about K-9 tracking. If a person were actively bleeding as they left the scene of an incident, how might that affect a K-9's ability to track that person?
> A. Oh, I've experienced that, where a person who's bleeding heavily, especially, it's essentially a pretty easy track because that blood is -- you know, we've heard the term blood trail, it's a real thing. When the blood is being dropped on the ground, especially if there's a lot of blood being dropped on the ground, the dog is picking that up very quickly. And the dog works very quickly through a track of that nature because that scent is much more enhanced than even sweat or skin cells, for instance. So the blood is going to be picked up very quickly by a dog.

The trial court did not err by overruling Salas's relevancy objection. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "The threshold to

16

admit relevant evidence is very low. Even minimally relevant evidence is admissible." State v. Darden, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).

Detective Betts's testimony was relevant because it provided an explanation as to why the attempted dog track of Salas may have been unsuccessful in locating him. Indeed, during closing argument, Salas's defense counsel argued that the individuals who investigated the murder did "some bad police work." Detective Betts's testimony provided an explanation, aside from there being a sloppy police investigation, as to why a dog track may not result in the perpetrator being found. For example, Detective Betts testified that, when an individual is "bleeding heavily" "it's essentially a pretty easy track." According to Detective Betts, "[w]hen the blood is being dropped on the ground, especially if there's a lot of blood being dropped on the ground, the dog is picking that up very quickly." By contrast, Detective Betts testified, "[s]mall amounts [of blood] . . . are going to be picked up with less ease than larger amounts, but it still gets picked up." This testimony was material to an explanation of why the investigation of Salas may have initially been unsuccessful in locating him. Thus, the trial court did not err by overruling Salas's relevancy objection.[5]

Salas contends that Detective Betts's testimony was not relevant under our Supreme Court's decision in State v. Lord, 161 Wn.2d 276, 165 P.3d 1251 (2007). According to Salas, the Lord decision requires that, for "dog-tracking evidence" to be relevant, (1) the individual who conducted the dog track in question must testify, and (2) that individual must also testify that the scent in

---

[5] Similarly, the testimony that came in without objection does not provide a basis for appellate relief.

question originated from the date that the crime occurred. He is wrong. In Lord, the court held that a trial court did not abuse its discretion by excluding as irrelevant testimony by a dog handler when "[t]he dog handler could not narrow the date of the scent trail followed by his dogs beyond a two week window." 161 Wn.2d at 294. The court explained that the victim "had been to the [area in question] many times during that period, and the dog handler could not definitively testify that the track his dog followed was made on the day that [the victim] disappeared." Lord, 161 Wn.2d at 295. Because the dog handler could not "express an opinion to a reasonable degree of probability, . . . [the handler's] opinion [did] not make [any] material issue more or less likely." Lord, 161 Wn.2d at 295 n.16.

Lord did not announce a requirement that, for *any* testimony concerning dog-tracking to be admissible, the witness must have actually conducted a dog track in relation to the case. Rather, it provided that, when such an individual testifies about a scent detected by a tracking dog, the witness must express an opinion within a reasonable degree of probability as to when the scent followed was originated, particularly when other evidence indicates that the scent may have been left at the scene on another date. Lord, 161 Wn.2d at 295.

Detective Betts's testimony was materially distinguishable. Rather than explain how a tracking dog located Salas, his purpose in testifying was to set forth reasons why that had not occurred. Such testimony did not require the same predicate testimony.

18

Salas next asserts that Detective Betts's testimony was not relevant because the State did not satisfy the foundational requirements for dog-tracking evidence set forth in State v. Loucks, 98 Wn.2d 563, 656 P.2d 480 (1983). Not so. In Loucks, our Supreme Court explained that, in order for evidence that is derived from a dog track to be admitted, the following foundational requirements must be satisfied:

> "(1) the handler was qualified by training and experience to use the dog, (2) the dog was adequately trained in tracking humans, (3) the dog has, in actual cases, been found by experience to be reliable in pursuing human track, (4) the dog was placed on track where circumstances indicated the guilty party to have been, and (5) the trail had not become so stale or contaminated as to be beyond the dog's competency to follow."

98 Wn.2d at 566 (quoting State v. Socolof, 28 Wn. App. 407, 411, 623 P.2d 733 (1981)).

The Loucks opinion is of no aid to Salas. Salas did not object to Detective Betts's testimony on the specific ground of lack of foundation. Thus, his assignment of error is waived. See Henson, 11 Wn. App. 2d at 102; ER 101(a)(1); RAP 2.5(a). Moreover, even if Salas had objected on the ground of foundation, his objection would have been correctly overruled. The foundational requirements described in Loucks apply when a dog handler testifies about evidence that results from an actual dog track. See 98 Wn.2d at 564 (dog-tracking evidence in question was "evidence provided by police dog Tally of the Seattle Police Department's canine unit"). These requirements do not apply when a witness testifies generally about dog tracking.[6]

_____

[6] Salas also asserts that "dog-tracking evidence" requires the trial court to provide a cautionary instruction when requested by the defense. See State v. Wagner, 36 Wn. App. 286,

19

Finally, Salas contends that the trial court erred by admitting Detective Betts's testimony because the testimony violated a pretrial ruling. Based on a pretrial agreement between the parties, the trial court entered a ruling, which—without naming particular witnesses—"[e]xclude[d] expert witness or expert testimony not previously disclosed to the defense." Salas avers that, because Detective Betts was not identified as an expert witness, no objection was required on his part in order to preserve the claim of error. However, in order to preserve the claim of error on appeal, Salas must have raised an objection that would have provided the trial court "the opportunity to correct the error." Powell, 166 Wn.2d at 82. That did not happen here. Indeed, the trial court was not called on to determine whether Detective Betts's proposed testimony fell within the pretrial ruling. Thus, the claim of error was waived. RAP 2.5(a).

The trial court did not err by admitting Detective Betts's testimony.

V

Salas next contends that the prosecutor engaged in misconduct by eliciting "misleading" testimony from Detective Betts and using this testimony to make a "false" argument to the jury. Salas claims that the prosecutor's asserted misconduct deprived him of his due process right to a fair trial. We disagree.

The United States and Washington Constitutions guarantee persons accused of a crime the right to a fair trial. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, §§ 3, 22. "We review alleged due process violations de

---

287-88, 673 P.2d 638 (1983). Even if Salas had requested a cautionary instruction, he would not have been entitled to such an instruction. Indeed, Detective Betts did not testify about any evidence derived from the tracking dog that was used during the investigation. Rather, he testified generally about dog tracking.

novo." State v. Seward, 196 Wn. App. 579, 584, 384 P.3d 620 (2016). "A defendant arguing that prosecutorial misconduct violated his or her right to a fair trial has the burden of showing the prosecutor's conduct was both improper and prejudicial." State v. Walker, 182 Wn.2d 463, 477, 341 P.3d 976 (2015).

It is well established that a prosecutor "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. Furthermore, "when it should be obvious to the Government that [a] witness' answer, although made in good faith, is untrue, the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury." United States v. Harris, 498 F.2d 1164, 1169 (3d Cir. 1974). "'Mere inconsistency' between witnesses' testimony is not necessarily perjury, and not every contradiction is material." United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995) (quoting United States v. Nelson, 970 F.2d 439, 443 (8th Cir. 1992)). A new trial is required if the uncorrected false testimony "could . . . in any reasonable likelihood have affected the judgment of the jury." Napue, 360 U.S. at 271.

Salas asserts that the prosecutor violated his due process right to a fair trial by stating the following during closing argument:

> What's also inconsistent is the K-9 track. The K-9 unsuccessfully tracked the defendant, didn't actually track him. What did Detective Betts tell about a dog track? Someone, an active bleeder, super easy to track. Literally following a trail of

blood. It's inconsistent. Those injuries didn't occur there and they didn't occur at the hands of [Lopez].

Salas concedes that "this argument appears to be supported by the evidence." Indeed, Detective Betts testified that "it's essentially a pretty easy track" when the person being tracked is "bleeding heavily." Moreover, Salas testified that, as he was leaving Lopez's apartment, Salas was "bleeding a lot" and he did not wrap up his wound until he returned to his apartment 14 hours later. Throughout the night, Salas slept in "the woods," where he remained for approximately 14 hours. However, the dog track did not result in Salas being located. In the State's framing of the evidence, the tracking dog's failure to locate Salas was inconsistent with Salas suffering the knife cut at the hand of Lopez.

Nevertheless, Salas contends that, in light of expert testimony that was elicited during the first trial, but not admitted at the second trial, the prosecutor's argument was "false and misleading." According to Salas, the "prosecutor deliberately elicited misleading expert testimony in order to support an argument to the jury that the prosecutor knew to be false." The case law and record do not support Salas's contention.

First, we note that "the State [was] free to present new evidence at retrial." State v. McKee, 193 Wn.2d 271, 278, 438 P.3d 528 (2019). Thus, the State was free to present, and argue reasonable inferences from, Detective Betts's testimony. See State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d (2011) ("In closing argument the prosecuting attorney has wide latitude to argue reasonable inferences from the evidence.").

Second, the prosecutor's argument was neither false nor misleading in light of the expert testimony at the first trial.[7]  During the first trial, Deputy Matthew Boice, a dog handler, testified about dog tracks that he had conducted near Lopez's apartment.  According to his testimony, Deputy Boice initiated a dog track at Lopez's apartment building where he observed "a bloody handprint on the side of the building which kind of ran downward" and "blood droplets" that were located "underneath the building."  Deputy Boice also noticed that "there were foot impressions in the ground."  The police dog, Kilo, detected a scent.  Kilo then led Deputy Boice to building 18 of the apartment complex.[8]  Deputy Boice and Kilo circled the exterior of building 18 but "the track ended at Building 18" and they "did not locate a specific person."  Deputy Boice then "ran [Kilo] around the entire exterior of [the] whole complex . . . trying to locate where [the] scent went."  Kilo "did not give any indications."  This led Deputy Boice to conclude that "whoever [they] were tracking either went into one of the apartments inside Building 18 or . . . got picked up at a vehicle from that general area."

Deputy Boice also testified that, after Kilo had tracked the scent to building 18, he and Kilo were "pulled off [that] track" in order to "look at some other location" "on the west side of the complex."  Deputy Boice commanded Kilo to look for the same scent at that location and, over the course of an hour to an

<hr />

[7] The testimony elicited during the first trial is available to us but is not formally part of the record of this case.  See, e.g., State v. Blight, 89 Wn.2d 38, 46, 569 P.2d 1129 (1977) ("We may not speculate upon the existence of facts that do not appear in the record.").  However, because the State does not contest the propriety of our consideration of the first-trial testimony, we will consider it in resolving this claim.

[8] Salas's apartment was located inside building 18.  Lopez's apartment was located inside building 13.

hour and a half, Kilo did not detect the scent on the west side of the apartment complex.

Deputy Boice and Kilo then returned to building 18. Upon their return, Deputy Boice noticed that the scene around building 18 had become contaminated. He determined that there were "scents of dozens of other people, weather, wind, other animals, [and] cars." At that moment, according to Deputy Boice, "it would [not] be realistic for [Kilo] . . . [or] any other dog to re-engage that exact same track."

Salas asserts that Deputy Boice's testimony established that "the failure of the track was not because Mr. Salas was not bleeding heavily, but because of an error by the police in removing the dog from the track and the conditions of the area." However, Deputy Boice's testimony did not conclusively establish that Kilo was unable to locate Salas for either of those reasons. Rather, Deputy Boice's testimony was entirely consistent with the prosecutor's argument that the dog track was unsuccessful because Salas was not actively bleeding. Indeed, Kilo was able to track the scent only from the exterior of Lopez's apartment to building 18. Kilo was not able to track the scent *anywhere else* within the apartment complex, even though Deputy Boice "ran him around the entire exterior of [the] whole complex." Yet Salas testified that, after he departed from Lopez's apartment, he was "bleeding a lot" and did not return to his apartment until 14 hours later. Throughout the night, Salas slept in "the woods," where he remained for approximately 14 hours. Salas stated that he did not wrap up his wound until he returned to his apartment.

24

Despite the fact that Salas claims to have been "bleeding a lot" and that he fled to "the woods," Kilo did not pick up on Salas's scent anywhere surrounding the exterior of the apartment complex. Thus, the prosecutor's argument in the second trial was neither false nor misleading in light of Deputy Boice's testimony in the first trial.

Additionally, case law does not support Salas's contention that the presentation of Detective Betts's testimony violated his right to due process. Indeed, Salas does not assert that Detective Betts's testimony was false. See Miller v. Pate, 386 U.S. 1, 7, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967) ("[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence."). Rather, Salas contends that the testimony was "misleading" in light of Deputy Boice's testimony in the first trial.

In support of this contention, Salas cites to a Michigan appellate court's decision in People v. Smith, 498 Mich. 466, 870 N.W.2d (2015). In that case, a witness "had been compensated for his assistance in a [law enforcement] inquiry into [the victim]'s murder and a suspected criminal enterprise involving the defendant." Smith, 498 Mich. at 471. However, the witness testified that "he was not paid for his cooperation in relation to 'this case,' i.e., the *prosecution* of the defendant for [the victim]'s murder." Smith, 498 Mich. at 472 (emphasis added). Knowing that the witness had been compensated for assisting in the criminal investigation that regarded the case, the prosecutor, in an argument to the jury, "cement[ed] the false notion that [the witness] had only been paid for his

25

cooperation in *other cases*." Smith, 498 Mich. at 474. The court explained that "[t]he overall impression conveyed [by the testimony] was false" and that "[i]nstead of rectifying this false impression . . . the prosecutor capitalized on and exploited it." Smith, 498 Mich. at 478. Thus, the court held, the prosecutor violated the "duty to correct false testimony." Smith, 498 Mich. at 480.

No such thing happened in Salas's second trial. As already explained, Deputy Boice's testimony in the first trial was not contrary to the State's argument in the second trial that the dog track did not successfully locate Salas because Salas was not bleeding heavily. Detective Betts's testimony did not convey a false impression. The testimony was not misused by the prosecutor in closing argument.

Salas's claim of error fails.[9]

VI

Salas finally asserts that the trial court mistakenly ordered, as a condition of community custody, that he pay supervision fees. We agree.

RCW 9.94A.703(2) provides that "[u]nless waived by the court, as part of any term of community custody, the court shall order an offender to: . . . (d) Pay supervision fees as determined by the department." Because "the supervision fees are waivable by the trial court they are discretionary [legal financial obligations]." State v. Dillon, 12 Wn. App. 2d 133, 152, 456 P.3d 1199, review denied, 195 Wn.2d 1022 (2020).

---

[9] Salas also asserts that cumulative error deprived him of a fair trial. "The cumulative error doctrine applies when several trial errors occurred and none alone warrants reversal but the combined errors effectively denied the defendant a fair trial." State v. Jackson, 150 Wn. App. 877, 889, 209 P.3d 553 (2009). Because no trial errors occurred, there was no cumulative error.

At sentencing, the court found Salas to be indigent, and stated:

> Since Mr. Salas is incarcerated, I'll have him pay a minimum of $10 per month on the financial obligations.
> I'll waive everything except for the $500 victim penalty assessment, the $100 biological sample fee, and if there's restitution.

The trial court did not mention supervision fees. However, the judgment and sentence signed by the judge required Salas to "pay supervision fees as determined by [the Department of Corrections]." Pursuant to Dillon, this requirement must be eliminated on remand.

The conviction is affirmed. The judgment is reversed and remanded to the trial court to eliminate the requirement of payment of supervision fees.

WE CONCUR: