**Opinion filed September 23, 2021**



## In The

# Eleventh Court of Appeals

_____

## No. 11-19-00310-CR

_____

## JUSTIN D. BENNETT, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 42nd District Court**
**Callahan County, Texas**
**Trial Court Cause No. 7234**

## M E M O R A N D U M   O P I N I O N

The jury convicted Justin D. Bennett of murder and assessed his punishment at confinement for a term of seventy years in the Institutional Division of the Texas Department of Criminal Justice. The jury also assessed a fine of $10,000. In a single issue, Appellant challenges the sufficiency of the evidence to support his conviction. We affirm.

*Background Facts*

The State charged Appellant by indictment with the murder of Meagan Dearman by either (1) intentionally or knowingly causing her death by strangling her "with his hands, arms, a rope or string, or a combination of those items" or (2) intending to cause serious bodily injury to Dearman by committing an act clearly dangerous to human life—strangling her—that caused her death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2019). Appellant and Dearman were in a dating relationship. During their relationship, Appellant was also seeing another woman: Jennifer Herod.

Dearman's mother, Jan Campbell, testified that at some point in January 2017, she stopped getting communications from Dearman. The last time she heard from Dearman was on January 17, 2017. Campbell also testified that Dearman did not post anything on Facebook after January 17. Denise James, Dearman's cousin, had tried for several days to contact Dearman but had been unable to reach her. James also noticed that Dearman did not post anything on Facebook after January 17, which was unusual for her. James made several attempts to reach Dearman by phone, and on one attempt, Appellant answered Dearman's phone and stated that he did not know where she was and that he was looking for her as well.

On January 25, 2017, Dearman's family and friends filed a missing person report for Dearman with the Abilene Police Department. They reported that no one had heard from Dearman since January 17, 2017, and that there was a rumor circulating that her boyfriend, Appellant, had killed and buried her. This rumor arose after Appellant visited with Verishana Reed, the mother of Appellant's child. During this visit, Appellant told Reed that he and Dearman had had a fight. However, he did not mention that Dearman was missing. Reed described Appellant as "like a ticking time bomb," and she had assumed that Appellant beat Dearman up during their fight.

Detective Paul Martinez testified that the police focused their investigation on Appellant. On January 26, 2017, the police located Appellant at Lacy Morris's house in Merkel. Morris and Herod were best friends. When the police arrived at Morris's house, Appellant instructed Morris to tell the police that he was not present. However, she eventually consented to a search of her residence. The police soon located Appellant attempting to conceal himself.

The police arrested Appellant based on four outstanding warrants that he had at the time. After arresting Appellant, the police seized his size sixteen black Nike shoes, his wallet, and his cell phone. Detective Martinez then interviewed Appellant. Appellant initially told Detective Martinez that he did not know Dearman. Appellant also told Detective Martinez that "he didn't give a f--k" about what might have happened to Dearman.

After arresting Appellant, the police shifted their investigation toward locating Herod. During their investigation, the police learned that Appellant frequently drove Herod's white Buick Rendezvous. Upon locating Herod, the police conducted a search of her Buick. The search revealed blood stains that were subsequently identified as a match to Dearman's blood.

On January 27, 2017, the day after Appellant's arrest, a property owner discovered Dearman's body, covered with weeds, near T&P Lake. Detective Martinez testified that the weeds were clearly used in an attempt to conceal the body. The police were also able to locate and photograph shoe print impressions near the body that were similar in size and impression to the shoes seized from Appellant.

Dearman's body was fully clothed, and a shoestring was tightly tied around her neck. Dearman's body was in the early stages of decomposition, and it had blood coming from the nose and mouth. Dr. Marc Krouse performed an autopsy on Dearman's body. From the autopsy, Dr. Krouse was able to conclude that

Dearman's cause of death was ligature strangulation and that the manner of death was homicide.

Detective Martinez obtained a search warrant for the prior locations of the cell phones of Herod, Dearman, and Appellant. FBI Special Agent Wendell Cosenza determined that around 8:30 a.m. on January 18, 2017, the cell phones of Herod, Dearman, and Appellant were each connected to cell phone towers in the same area of Abilene. Between the hours of 9:00 and 10:00 a.m., both Appellant's and Herod's cell phones were connected to cell towers in both Clyde and Baird. Specifically, when Appellant's and Herod's cell phones were connected to the cell tower in Baird, their phones were connected to the tower that covered T&P Lake.

Along with the warrant for the cell tower locations, Detective Martinez also obtained a search warrant for text message information from the cell phones of Herod, Dearman, and Appellant between January 17 and January 26, 2017. The police discovered text messages and call logs between Dearman and Appellant where the two were arguing about Appellant's relationship with Herod. Dearman told Appellant that she was "2 seconds from calling that bitches [sic] p.o." Several hours later, after continuous argument through text messages, Appellant texted Dearman the following message on January 18 at 5:31 a.m.: "I don't want to talk to you right now because you are pissing me off and raising my blood pressure so LEAVE ME ALONE I DON'T WANT TO DO THIS." After several more messages from Dearman, Appellant sent the same exact message to her again telling Dearman to leave him alone. Dearman continued to text Appellant several more times before finally telling Appellant at 8:17 a.m.: "I'm getting in the car and leaving with u there lights r off and your not leaving me cold."

The text messages of Appellant and Herod also showed a conversation between the two on January 24, 2017. During their conversation, Appellant stated: "Her mom called me again she is losing it. I need someone right now and I have no

4

one." In addition to stating that he needed someone, Appellant also told Herod that he "should have given her the gun. . . . S--t I still might." Later in their text exchange, after Appellant informed Dearman's mother that he did not know where she was, Appellant told Herod: "I don't know if I can hold it together I'm over the part about her but her mother that's a hole [sic] different story." In response to these and other text messages, Herod told Appellant: "You made the best decision you could for the situation we were in." Finally, Appellant told Herod that he should not have placed her in this "situation."

Prior to her death, Dearman had stayed with a friend, John Ford, at his residence at 917 Graham Street in Abilene. Ford knew both Dearman and Appellant. Two or three days after Ford last saw Dearman, Appellant arrived at the 917 Graham Street address with Herod. During this meeting, Appellant told Ford that he needed to destroy something and asked if he could burn the item in Ford's backyard. After agreeing to let Appellant burn the item in his backyard, Ford went inside the house. Upon his return outside, Ford noticed that there was some smoke in the air and that Appellant and Herod had left the residence.

On January 31, 2017, the Abilene Police Department received a tip that the backyard of the Graham Street house contained the burned remains of Dearman's clothing. Upon obtaining the consent of the homeowner, the police were able to locate a burned pair of blue jeans and a shirt.

Following the autopsy and the recovery of the burned clothes, the Tarrant County Medical Examiner's Office (ME) conducted a DNA test on the ligature. It revealed that Dearman's DNA was on the ligature along with a minor amount of DNA from a male. However, the male DNA was not enough to make a comparison to any known person. Additionally, the ME conducted a DNA test on the burned clothes taken from the Graham Street house. The test revealed the presence of DNA

from a male contributor, but no affirmative match could be made due to the damage done to the clothes.

Jennie Chandler was Dearman's longtime friend. Between the dates of December 30, 2016, and January 16, 2017, Dearman would occasionally stay at Chandler's house. Chandler was aware of Dearman's relationship with Appellant. On December 30, Dearman and Chandler went to Walmart so Dearman could wire $2,500 to California for Appellant and Appellant's associate, Casye Cotton. However, the wire transaction was ultimately unsuccessful, and the money was returned to Dearman on December 31. Instead of returning the money to Appellant, Dearman gave $375 of the $2,500 to Chandler. In addition, Dearman purchased a new cell phone and other various items for herself with the money.

On January 15, Dearman spent the night at Chandler's House. The next day, Dearman spent much of her day in and out of Chandler's house and arguing on her cell phone. During one of her absences from Chandler's house, Dearman called Chandler and asked Chandler to return the $375 she had given her. However, Chandler had already spent $325 of the $375 Dearman gave her.

Later that same day, Dearman left with Appellant at 6:00 p.m. and did not return to Chandler's residence until 11:00 p.m. Upon their return to Chandler's residence, Appellant and Dearman were fighting about the $2,500. Chandler testified that, during this argument, Appellant stated: "I'll kill you, I'll kill her, and I'll kill him, or anybody around here if you don't have the money." Appellant and Dearman left Chandler's residence shortly after this exchange. The next day, January 17, Dearman again called Chandler asking for money. In the background of this conversation, Chandler overheard Appellant saying that he needed his "F'ing money" and that Dearman was a "stupid B word." After this phone conversation, Chandler received one more text from Dearman before never hearing from her again.

Throughout Appellant's time in the Taylor County Jail, he made several phone calls to Herod. During these phone calls, Appellant asked Herod to marry him so she could not be forced to testify against him. He also told Herod that she had nothing to do with it; that he was the "dumbass"; and finally, that he was an idiot and that, if it were not for him, they would not be in this "situation."

Herod did not testify at trial. However, Detective Martinez testified that she provided the following information about what transpired:

> [O]n the day of the 18th, January 18th, she was at Justin Bennett's residence, 233 North Jefferson, Apartment C, when he showed up there at the residence saying that he wanted her to go with him because he was going to go scare Meagan Dearman. So she got in her vehicle with him and they went to 918 Graham. Meagan Dearman came out with all her belongings, suitcase, and her bag of clothes. And Jennifer Herod was in the driver seat. Justin Bennett got in the back seat with Meagan where they were talking. And they were supposed to go to the lake, which Jennifer Herod claimed she didn't know where the lakes were in Abilene, but she knew where the lakes were here in Baird because she's from Clyde. So she then began driving this way, and eventually ended up on I-20.
>
> She claims that they began to argue in the back seat. And Meagan was trying to make a phone call when Justin snatched the phone away from her on I-20 and threw the phone out the window, and then eventually made it to here at T&P Lake where they were in the back seat talking. And Jennifer Herod claims that Justin Bennett lunged at Meagan Dearman and started strangling her, and that she could [hear] Meagan Dearman saying, Please, Justin, stop, stop and could hear her being strangled.

*Analysis*

In his sole issue, Appellant challenges the sufficiency of the evidence supporting his conviction for murder. He generally asserts that the evidence was insufficient to show that he caused Dearman's death. Appellant asserts that the evidence against him was merely speculative and not sufficient for a jury to find him guilty beyond a reasonable doubt.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson* 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013) (*Winfrey II*); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13.

Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514, S.W.3d 227, 232 (Tex. Crim. App. 2017).

Appellant contends that there was no evidence connecting him to the victim's body, the location where the body was found, the car that transported the body, or the ligature. Essentially, he alleges that "the circumstantial evidence of his guilt relies on the stacking of speculative inferences." In this regard, a jury is prohibited from drawing conclusions based on speculation. *Anderson v. State*, 416 S.W.3d 884, 888 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 15). "Speculation is mere theorizing or guessing about the possible meaning of the facts and evidence presented." *Id.* (quoting *Hooper*, 214 S.W.3d at 16). Conversely, "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them." *Id.* "Juries are permitted to draw multiple reasonable inferences from the evidence as long as each inference is supported by the evidence presented at trial[.]" *Id.* (citing *Hooper*, 214 S.W.3d at 15).

We begin our analysis with the testimony from Detective Martinez that Herod stated that she was present when Appellant strangled Dearman in the back seat of her vehicle. Appellant dismisses this statement as unsupported hearsay accusations from an accomplice that cannot support a finding of guilt beyond a reasonable doubt. We disagree with Appellant's assessment of Herod's statement to the police. Under the *Jackson v. Virginia* sufficiency standard, uncorroborated accomplice witness testimony "can be sufficient to support a conviction." *Taylor v. State*, 10 S.W.3d 673, 684–85 (Tex. Crim. App. 2000). Furthermore, we must consider all evidence, even improperly admitted evidence, when conducting a sufficiency review. *See*

*Winfrey II*, 393 S.W.3d at 767; *Moff v. State*, 131 S.W.3d 485, 488 n.11 (Tex. Crim. App. 2004) (citing *Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988)).

There is also ample circumstantial evidence that supports Appellant's conviction. The most significant piece of circumstantial evidence in this case is that Dearman's blood was found in Herod's vehicle. Appellant attempts to discount this evidence by asserting that the State failed to prove that Appellant drove the white Buick to T&P Lake. However, Verishana Reed testified that she would regularly see Appellant in Herod's vehicle, and Ford testified that when Appellant came to Ford's home to burn some clothes, Appellant was in Herod's white Buick. This evidence of Appellant's use of the Buick, taken together with Herod's statement to the police, would allow a rational jury to infer and conclude that Appellant traveled in the white Buick to T&P Lake at or near the time that Dearman was strangled.

Appellant contends that no evidence exists to connect him to the lake where Dearman's body was found. However, Appellant's cell phone "pinged" the same cell phone tower that covers the area where Dearman's body was found. Appellant seeks to discount this evidence by contending that the pings cannot precisely show where the cell phone was located within the tower's range, and the State did not prove that it was Appellant who was using the cell phone that day. While the State did not prove specifically where the cell phone was located at T&P Lake, it could eliminate any other possible location not covered within the T&P Lake cell phone tower. Moreover, while the State did not prove that it was Appellant using the cell phone at T&P Lake, it did show that Appellant used the same phone to text message Dearman the morning that Appellant's phone connected to the T&P Lake cell phone tower. Additionally, the State proved that Appellant was the owner of the phone by showing that it was seized from Appellant when he was arrested.

Furthermore, it is significant that there were footprint impressions found at the lake that were similar to the shoes seized from Appellant. A size sixteen shoe is

unusual. Taken together, a rational jury could find that Appellant was present at T&P Lake at or near the time that Dearman's body was left there.

Appellant further contends that the State's evidence that he had a motive to kill Dearman is mere speculation. Appellant based this contention on the fact that two weeks had passed between Dearman receiving the wire money back and her death. However, on both January 16 and 17, Dearman asked Chandler to return the money that Dearman had given her. On one occasion, Chandler heard Appellant threaten to kill not only Chandler, but also Dearman. On the other occasion, Chandler heard Appellant say that he needed his "F-ing money" and that Dearman was a "stupid B word."

Furthermore, Appellant contends that his text messages and phone conversations with Herod are nothing more than Appellant feeling somehow morally responsible for the death of Dearman. However, the actual content of the messages and phone conversations tells a different story. Specifically, Appellant told Herod that Dearman's mother kept calling him and that he "should have just given her the gun." Moreover, in Appellant's phone conversations from jail, Appellant tries to console Herod by assuring her that he is the one at fault, not her. In addition, Appellant's conversation with Detective Martinez refutes Appellant's contention that he felt morally responsible for Dearman's death. When asked how he felt about Dearman, Appellant stated that "he didn't give a f--k." We find that it was reasonable for the jury to rely on the texts and phone calls as circumstantial evidence of Appellant's guilt.

Appellant contends this case is similar to the circumstances in *Winfrey v. State*, 323 S.W.3d 875 (Tex. Crim. App. 2010) (*Winfrey I*). In *Winfrey I*, the only evidence that purported to connect the defendant to the murder scene was a canine-scent lineup. 323 S.W.3d at 881. The court addressed "whether dog-scent lineup evidence alone can support a conviction beyond a reasonable doubt." *Id.* at 881–86.

The court concluded that this evidence, standing alone, cannot support a conviction beyond a reasonable doubt. *Id.* at 886. At most, dog-scent lineup evidence raises only a suspicion of guilt. *Id.* at 882. Appellant's reliance on *Winfrey I* is misplaced because the holding is limited to a specific type of evidence that is not present in this case.

Unlike the situation in *Winfrey I*, the evidence in this case does not merely raise a suspicion of Appellant's guilt. In addition to Herod's statement implicating Appellant in Dearman's murder, the circumstantial evidence of his guilt is overwhelming. Contrary to Appellant's contention, this is not a case where the jury was required to speculate by guessing about the meaning of the evidence presented at trial. *See Anderson*, 416 S.W.3d at 888 (citing *Hooper*, 214 S.W.3d at 16). Instead, the evidence presented at trial permitted the jury to reasonably infer that Appellant murdered Dearman as alleged in the indictment. *See id.* Viewed in the light most favorable to the verdict, we hold that there is sufficient evidence from which a rational trier of fact could have concluded beyond a reasonable doubt that Appellant committed the murder of Dearman. We overrule Appellant's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


September 23, 2021

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.